ACCEPTED
01-15-00354-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
11/13/2015 11:19:52 AM
CHRISTOPHER PRINE
CLERK

# No. 01-15-00354-CV
# In the First Court of Appeals
# Houston, Texas

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

11/13/2015 11:19:52 AM

CHRISTOPHER A. PRINE
Clerk

## HARRIS COUNTY, TEXAS

PLAINTIFF/APPELLANT/CROSS-APPELLEE

V.

## INTERNATIONAL PAPER CO.

DEFENDANT/APPELLEE/ CROSS-APPELLANT

On Appeal from the 295th District Court of Harris County, Texas
No. 2011-76724

## APPELLANT HARRIS COUNTY'S
## BRIEF AND APPENDIX

Rock W.A. Owens
Texas Bar No. 15382100
Vince Ryan
Harris County Attorney
Texas Bar No. 99999939
Terence L. O'Rourke
Special Asst. Harris County Attorney
Texas Bar No. 15311000
OFFICE OF HARRIS COUNTY ATTORNEY
VINCE RYAN
1019 Congress, Room 1547
Houston, Texas 77002
Telephone: (713) 755-5908
Fax: (713) 437-4211
rock.owens@cao.hctx.net

Debra Tsuchiyama Baker
Texas Bar No. 15089600
Earnest W. Wotring
Texas Bar No. 22012400
John Muir
Texas Bar No. 14630477
David George
Texas Bar No. 00793212
BAKER•WOTRING LLP
700 JPMorgan Chase Tower
600 Travis Street
Houston, Texas 77002
Telephone: (713) 980-1700
Fax: (713) 980-1701
dbaker@bakerwotring.com

Counsel for Appellant Harris County, Texas

# ORAL ARGUMENT REQUESTED

# IDENTITY OF PARTIES AND COUNSEL

| Parties | Counsel |
|---|---|
| Plaintiff/Appellant/<br>Cross-Appellee<br>Harris County, Texas | Rock W.A. Owens<br>Practice Group Manager<br>Environment & Infrastructure Group<br>Harris County Attorney's Office<br>Vince Ryan<br>Harris County Attorney<br>Terence L. O'Rourke<br>Special Asst. Harris County Attorney<br>OFFICE OF HARRIS COUNTY ATTORNEY<br>VINCE RYAN<br>1019 Congress, Room 1547<br>Houston, Texas 77002<br><br>Debra Tsuchiyama Baker<br>Earnest W. Wotring<br>John Muir<br>David George<br>BAKER•WOTRING LLP<br>700 JPMorgan Chase Tower<br>600 Travis Street<br>Houston, Texas 77002 |
| Defendant/Appellee/<br>Cross-Appellant<br>International Paper Co. | Winstol D. Carter, Jr.<br>Allyson N. Ho<br>Craig A. Stanfield<br>MORGAN, LEWIS & BOCKIUS LLP<br>1000 Louisiana Street, Suite 4000<br>Houston, Texas 77002 |

Necessary and Indispensable Party
The State of Texas, acting by and through Texas Commission on Environmental Quality

Mary E. Smith
Anthony Benedict
Assistant Attorney General
Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711

# TABLE OF CONTENTS

Identity of Parties and Counsel ....................................................................................... ii

Table of Contents ........................................................................................................... iv

Index of Authorities ...................................................................................................... vii

Record Citation Abbreviations ....................................................................................... xii

Statement of the Case .................................................................................................. xiii

Statement Regarding Oral Argument ........................................................................... xiv

Issues Presented .......................................................................................................... xvi

Statement of Facts .......................................................................................................... 1

    In the 1960s, International Paper dumped its dioxin-contaminated
    paper-mill sludge into Pits next to the San Jacinto River. ................................. 1

    The Pits failed, releasing dioxin into the San Jacinto River. ............................ 5

    The EPA designated the Pits as a Superfund site in 2008 because of dioxin
    contamination from the sludge. ........................................................................ 10

    Harris County sued International Paper for civil penalties because the
    company caused, suffered, allowed, or permitted violations of Texas
    environmental laws. ......................................................................................... 11

    The trial court refused to allow evidence regarding the dangers of dioxin
    at trial. .............................................................................................................. 13

    The trial court refused to submit to the jury questions on whether
    International Paper caused, suffered, allowed, or permitted a public
    endangerment or a nuisance. .......................................................................... 21

    The trial court instructed the jury that International Paper no longer
    owned its dioxin-contaminated paper-mill sludge after it was dumped
    in the Pits. ......................................................................................................... 22

    The other defendants settled at the end of the trial before closing
    arguments. ........................................................................................................ 24

    The jury found for International Paper. ............................................................. 25

Standard of Review ....................................................................................................... 26

Summary of Argument .................................................................................................. 28

Argument ...................................................................................................... 30

I.  The trial court erred when it refused to submit to the jury Harris County's claims for endangerment of the public health and for nuisance. ........................................................................................... 31

    A.  The trial court erred when it refused to submit Harris County's claim for endangerment of the public health. ..................................... 31

    B.  The trial court erred when it refused to submit Harris County's claim for nuisance. ................................................................................. 35

        1.  International Paper's stipulation is evidence that the dioxin in the Pits created a nuisance. .................................................. 36

        2.  There is sufficient evidence in the record regarding nuisance in addition to International Paper's stipulation. ........................ 36

    C.  The trial court erred when it excluded evidence on endangerment and nuisance. ......................................................................................... 39

        1.  The trial court erred when it excluded the government reports on dioxin's health risks. ................................................. 40

        2.  The trial court erred in using Havner to determine the admissibility of evidence regarding dioxin's health risks. ......... 41

        3.  Harris County provided evidence that International Paper's dumping of the dioxin-laced sludge in the Pits endangered the public health and created a nuisance. ................................. 46

        4.  The trial court's improper exclusion of the evidence regarding the dangers of dioxin was reversible error. ............... 48

    D.  The endangerment and nuisance issues are not "functionally identical" to the submitted discharge question. ............................... 49

II.  The trial court erred in the jury instructions that it gave regarding International Paper causing, suffering, allowing, or permitting a discharge or imminent threat of discharge of waste. ............................... 56

    A.  The trial court erred when it instructed the jury that International Paper no longer owned the sludge as of 1966. .............. 56

        1.  International Paper did not conclusively establish that the ownership of its sludge passed to MIMC when MIMC took the sludge to the Pits. .................................................................. 58

        2.  International Paper did not conclusively establish that the sludge became a fixture to the real property after it was dumped in the Pits. .................................................................... 63

            a.  The sludge cannot be a fixture because it was not an improvement. ................................................................. 65

        b.     There was no intent to incorporate the sludge into the soil, so it is not a fixture.................................67

        c.     International Paper failed to conclusively establish that removing the sludge would materially damage the Site. ............................................................70

    3.    The trial court's erroneous instruction was reversible error because it related to a contested, critical issue. .........................71

  B.   The trial court erred when it instructed the jury that generating waste and contracting for disposal is not sufficient to establish liability. ................................................................74

Prayer ....................................................................................74

Certificate of Service ...............................................................76

Certificate of Compliance .........................................................76

Appendix

  Verdict (63 CR 35172-35199) .............................................A

  Final Judgment (64 CR 35217-35222) ..................................B

  Order Denying Harris County's Motion for New Trial (64 CR 35637-35638) .......................................................C

  Harris County's Notice of Appeal (63 CR 35681-35684) ..................................D

  Harris County's Requested Questions and Instructions Regarding Endangerment of the Public Health and Creation of a Nuisance (63 CR 35097-35098) ......................................................E

  State's Requested Questions and Instructions Regarding Endangerment of the Public Health and Creation of a Nuisance (63 CR 35127)...................................................................F

  Harris County's Requested Questions and Instructions Regarding whether Sludge was a Fixture (63 CR 35113-35116) .........................G

  Stipulation Regarding Dioxin (62 RR 9-11) .........................H

# INDEX OF AUTHORITIES

## Cases

Avanti Sales Int'l, Inc. v. Pycosa Chem., Inc.,
   No. 01-04-00983-CV, 2005 WL 2670740 (Tex. App.—Houston
   [1st Dist.] Oct. 20, 2005, no pet.) ........................................................50

BIC Pen Corp. v. Carter,
   346 S.W.3d 533 (Tex. 2011)..................................................................43

Borg-Warner Corp. v. Flores,
   232 S.W.3d 765 (Tex. 2007)..................................................................43

Bostic v. Georgia-Pac. Corp.,
   439 S.W.3d 332 (Tex. 2014).............................................................42, 44

Brown & Root, Inc. v. Shelton,
   No. 12-01-00259-CV, 2003 WL 21771917 (Tex. App.—Tyler
   July 31, 2003, no pet.) ..........................................................................65

City of Brownsville v. Alvarado,
   897 S.W.2d 750 (Tex. 1995)............................................................27, 48

City of Keller v. Wilson,
   168 S.W.3d 802 (Tex. 2005)..................................................................59

Columbia Rio Grande Healthcare, LP v. Hawley,
   284 S.W.3d 851 (Tex. 2009)..................................................................71

Cox v. Rhodes,
   233 S.W.2d 924 (Tex. Civ. App.—El Paso 1950, writ ref'd n.r.e.) .......68

Dow Chem. Co. v. Abutahoun,
   395 S.W.3d 335 (Tex. App.—Dallas 2013, no pet.).............................65

Dubin v. Carrier Corp.,
   731 S.W.2d 651 (Tex. App.—Houston [1st Dist.] 1987,
   writ dism'd) .......................................................................................65-66

Elbaor v. Smith,
   845 S.W.2d 240 Tex. 1992).............................................26, 31, 35, 48

Gulley v. Davis,
321 S.W.3d 213 (Tex. App.—Houston [1st Dist.] 2010,
pet. denied) ...................................................................... 27, 48

Hamid v. Lexus,
369 S.W.3d 291 (Tex. App.—Houston [1st Dist.] 2011, no pet.) .......... 26

Hansen v. Academy Corp.,
961 S.W.2d 329 (Tex. App.—Houston [1st Dist.] 1997, writ denied) .. 34

Hiles v. Arnie & Co.,
402 S.W.3d 820 (Tex. App.—Houston [14th Dist.] 2013,
pet. denied) ........................................................................... 34

Houston Bldg Serv., Inc. v. Am. Gen. Fire and Cas. Co.,
799 S.W.2d 308 (Tex. App.—Houston [1st Dist.] 1990, writ denied) .. 70

Hyundai Motor Co. v. Rodriguez,
995 S.W.2d 661 (Tex. 1999) ..................................................... 49

In re Dep't of Family & Protective Servs.,
273 S.W.3d 637 (Tex. 2009) ..................................................... 27

In re J.P.B.,
180 S.W.3d 570 (Tex. 2005) ..................................................... 27

In re Premcor Ref. Group, Inc.,
233 S.W.3d 904 (Tex. App—Beaumont 2007)
(orig. proceeding) ............................................... 35-37, 39, 54

Indiana Waste Sys. of Indiana, Inc. v.
Indiana Dept. of State Revenue,
633 N.E.2d 359 (Ind. T.C. 1994) ............................................... 59

Jamail v. Stoneledge Condominium Owners Ass'n,
970 S.W.2d 673 (Tex. App.—Austin 1998, no pet.) ............. 35-37, 39, 54

Lee v. Lee,
411 S.W.3d 95 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ........... 63

Melendez v. State,
902 S.W. 2d, 132 (Tex. App.—Houston [1st Dist.] 1995, no writ) ....... 70

Merck & Co. v. Garza,
347 S.W.3d 256 (Tex. 2011) .................................................................. 43

Merrell Dow Pharm., Inc. v. Havner,
953 S.W.2d 706 (Tex. 1997) ............. v, xiv, xvii, 20-21, 29, 40-45, 47, 74

Meyer Waste Sys., Inc. v. Indiana Dept. of State Revenue,
741 N.E.2d 1 (Ind. T.C. 2000) .......................................................... 59

Moore v. Carey Bros. Oil Co.,
269 S.W. 75 (Tex. Comm'n App. 1925) ............................................... 68

Parker v. Employers Mut. Liab. Ins. Co.,
440 S.W.2d 43 (Tex. 1969) ................................................................ 42

R.R. Comm'n of Tex. v. Waste Mgmt. of Tex.,
880 S.W.2d 835 (Tex. App.—Austin 1994, no writ) ....................... 59-60

R.R. St. & Co. v. Pilgrim Enter.,
166 S.W.3d 232 (Tex. 2005) .............................................................. 45

Reames v. Hawthorne-Seving, Inc.,
949 S.W.2d 758 (Tex. App.—Dallas 1997, pet. denied) .................. 65-66

Rosenboom Mach. & Tool, Inc. v. Machala,
995 S.W.2d 817 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) ... 34

Russell v. Am. Real Estate Corp.,
89 S.W.3d 204 (Tex. App.—Corpus Christi 2002, no pet.) ................. 60

Sharpe v. Turley,
191 S.W.3d 362 (Tex. App.—Dallas 2006, pet. denied) .................. 59-60

Shupe v. Lingafelter,
192 S.W.3d 577 (Tex. 2006) .............................................................. 26

Sonnier v. Chisholm-Ryder Co.,
909 S.W.2d 475 (Tex. 1995) ................................................... 65, 67-68

State ex rel. Wear v. Springfield Gas & Elec. Co.,
204 S.W. 942 (Mo. 1918) .................................................................. 38

Texas Gulf Sulphur Co. v. State,
16 S.W.2d 408 (Tex. Civ. App.—Galveston 1929, no writ) ................. 38

TH Inv., Inc. v. Kirby Inland Marine, LP,
218 S.W.3d 173 (Tex. App.—Houston [14th Dist.] 2007,
pet. denied) .................................................................................. 38

Thota v. Young,
366 S.W.3d 678 (Tex. 2012) ................................... 27, 58, 71, 73

Trust Co. Bank v. U.S. Gypsum Co.,
950 F.2d 1144 (5th Cir. 1992) ........................................... 65

Union Pac. R.R. Co. v. Williams,
85 S.W.3d 162 (Tex. 2002) ............................................... 27

Walker v. Gutierrez,
111 S.W.3d 56 (Tex. 2003) ............................................... 27

Westchester Fire Inc. Co. v. Roan,
215 S.W.985 (Tex. Civ. App.—Fort Worth 1919, writ ref'd) ............... 69

**Statutes**

Acts 1961, 57th Leg. 1st C.S., ch. 42, § 9 ............................... 11

Former TEX. WATER CODE § 7.107
(amended by Acts 2015, 84th Leg., ch. 542, § 1) ............... 12

TEX. WATER CODE § 7.101 ........................................... 11, 44

TEX. WATER CODE § 7.102 ........................................... 11, 44

TEX. WATER CODE § 7.107 ............................................... 12

TEX. WATER CODE § 7.351(a) ........................................... 11

TEX. WATER CODE § 7.353 ............................................... 12

TEX. WATER CODE § 26.121(a) ........................................ 12, 25

**Rules**

Tex. R. App. P. 9.7 ...................................................................... 74

Tex. R. Civ. P. 278............................................................... 26, 50

Tex. R. Evid. 401 ......................................................................... 40

Tex. R. Evid. 803(8) ............................................................... 40, 41

**Regulations**

30 Tex. Admin. Code § 335.1(140) ........................................... 32

30 Tex. Admin. Code § 335.1(80) ....................................... 32, 33

30 Tex. Admin. Code § 335.4 ................................... 12, 25, 31-32, 35, 52

**Other Authorities**

Black's Law Dictionary 2 (6th ed. 1990) ............................. 60

Restatement (Second) of Torts § 821B(1) ............................ 35-39, 54

# RECORD CITATION ABBREVIATIONS

"RR" refers to the Reporter's Record.

"CR" refers to the Clerk's Record.

"SCR" refers to the Supplemental Clerk's Record.  One volume of the Supplemental Clerk's Record has been filed.  The District Clerk did not include certain documents that Harris County requested to be included in the Clerk's Record.  Harris County, therefore, has requested an additional Supplemental Clerk's Record, but it has not been filed as of the time of the filing of this brief.  Harris County will cite to those documents as "2 SCR ___."

"PX" refers to the Plaintiff's Exhibits, which are located in volume 82 of the Reporter's Record.

"DX" refers to the Defendants' Exhibits, which are located in volumes 83 and 84 of the Reporter's Record.

"OPX" refers to Harris County's exhibits for its offer of proof on November 10, 2014, which are located in volume 86 of the Reporter's Record.

"CX" refers to the exhibits that were admitted for the trial court's use only, which are located in volume 87 of the Reporter's Record.

## STATEMENT OF THE CASE

**Nature of the Case**   This is an appeal after a jury trial in an environmental civil-penalty case brought by Harris County.

**Trial Court**   Hon. Caroline E. Baker
295th District Court of Harris County, Texas

**Course of Proceedings**   Harris County sued International Paper Co. and other companies for civil penalties for their decades-long pollution of the San Jacinto River with dioxin.[1]  The other defendants settled before the case was submitted to the jury.[2]

**Trial Court Disposition**   The trial court refused to submit Harris County's requested jury question on whether International Paper caused, suffered, allowed, or permitted a threat to public health or a nuisance, even though it had not granted a directed verdict on the issue.[3]  The trial court instructed the jury that International Paper ceased to own the waste at issue in the 1960s, even though that was a disputed issue.[4]  Based on the trial court's charge, the jury found for International Paper.[5]  The trial court entered a take-nothing judgment against Harris County based on the jury's verdict.[6]  It denied Harris County's motion for new trial.[7]

---

[1] 1 CR 73.

[2] 77 RR 7.

[3] 63 CR 35097-35098 (App. E); 63 CR 35127 (App. F).

[4] 63 CR 35177, 35183 (App. A).

[5] Id.

[6] 64 CR 35217 (App. B).

[7] 64 CR 35637 (App. C).

## STATEMENT REGARDING ORAL ARGUMENT

Harris County believes that this case presents the most significant issues of Texas environmental law within the last twenty-five years, if not since the Texas Water Code was amended in 1967 to permit local governments to bring civil-penalty actions.

The case presents an issue of first impression under Texas law on the appropriate scope of Merrell Dow Pharmaceuticals, Inc. v. Havner[8] applied in this government civil-penalty case: Whether the trial court must exclude a governmental entity in an environmental civil-penalty case from introducing any evidence that the defendants endangered public health and the environment unless the evidence meets Havner's doubling-of-the-risk requirement for establishing causation in a toxic-tort suit. Resolving that issue will include addressing:

- Whether Harris County should have been permitted to introduce evidence that dioxin in the San Jacinto River Waste Pits posed a danger to human health that was less than a doubling of the risk, and

- Whether reports and findings of governmental agencies (including The Texas Department of Health, United States Centers for Disease Control, the International Agency for Research on Cancer, and the United States EPA) are "junk science"

---

[8] Merrell Dow Pharm., Inc. v. Havner, 953 S.W.2d 706 (Tex. 1997).

because they do not demonstrate a doubling of the risk of cancer or other diseases.

In addition, this case involves unsettled issues regarding the ownership of contaminated waste. The trial court determined that the generator of dioxin-laced sludge can transfer ownership of that sludge to a third-party as a matter of law by having the sludge deposited on the third-party's land and walking away. This Court must determine whether the trial court correctly held that generators of dangerous waste can absolve themselves of legal responsibility by having the waste dumped on a third party's land and wishing it away.

Harris County requests oral argument to present these issues to this Court and to respond to any questions that this Court might have about these compelling issues. Given that International Paper has taken the extraordinary step of filing its own notice of appeal from the take nothing judgment in its favor, Harris County is confident that both sides can agree on this point, if perhaps no other.

# ISSUES PRESENTED

1.  The trial court erred when it refused to submit Harris County's issues to the jury on whether International Paper endangered the public health and welfare or caused a nuisance. Harris County's pleadings contained these causes of action, and the record contained evidence supporting them.

2.  The trial court erred when it excluded evidence of the threat that dioxin poses to public health and welfare. The trial court incorrectly excluded this evidence based upon its determination that Havner required it to exclude all evidence that dioxin posed a public-health risk unless the evidence demonstrated a doubling of the risk. This improperly added a causation standard used in toxic-tort cases into this government civil-penalty action.

3.  The trial court erred when it determined that International Paper did not own the dioxin-laced sludge dumped in the Pits. Before and during trial, the trial court determined that there was a fact issue on whether International Paper owned the sludge. When it charged the jury, the trial court changed its mind on this issue, and it instructed the jury that International Paper did not own the waste. Because the trial court misinterpreted the law on waste ownership and fixtures, it incorrectly found that International Paper transferred ownership of its sludge by having its sludge dumped on a third party's land.

4.  The trial court erred when it instructed the jury that generating waste and contracting for disposal is not sufficient to establish liability. (Harris County adopts the State's brief on this issue)

## STATEMENT OF FACTS

This case involves decades-long contamination of the San Jacinto River in Harris County with dioxin from International Paper's paper mill in Pasadena.[9]

**In the 1960s, International Paper dumped its dioxin-contaminated paper-mill sludge into Pits next to the San Jacinto River.**

The process that International Paper used to manufacture paper created waste, which it called "sludge."[10] The process also created a type of dioxin called 2,3,7,8-tetrachlorodibenzo-p-dioxin—commonly referred to as 2,3,7,8-TCDD—as a waste byproduct.[11] The dioxin was part of International Paper's sludge.[12]

Dioxins are a broad category of organic chlorinated hydrocarbons, meaning they are organic compounds containing hydrogen, carbon, and

---

[9] Champion Paper Co. was the entity that created the sludge at its paper mill in Pasadena, Texas, and that contracted to have the sludge dumped in the Pits. DX 1436. In 2000, Champion merged into International Paper, thereby becoming part of International Paper. 65 RR 37, 65. For simplicity, this brief will refer to both Champion Paper and International Paper as International Paper.

[10] PX 43 (International Paper referred to its waste byproduct as "sludge.").

[11] PX 922; DX 1451 at 1-3. For convenience, this brief will refer to 2,3,7,8-TCDD as "dioxin."

[12] 70 RR 197-199. Science and industry's knowledge of dioxin has grown over the years, but by the mid-1980s International Paper knew that its papermaking process created dioxin as a waste byproduct and that the dioxin was in the sludge. 70 RR 197-199; PX 922; DX 1451 at 1-3. The EPA designated dioxin as a hazardous substance in 1985. 70 RR 197.

1

chlorine atoms.[13] Dioxins are hazardous substances, and even scientists working with dioxins in the laboratory must use special precautions.[14] Laboratory scientists often use other substances with similar chemical properties as substitutes for dioxin because of its dangers.[15]

The EPA has determined that out of all the types of dioxin, 2,3,7,8-TCDD—the dioxin found in International Paper's sludge—"is considered the most toxic of the dioxins."[16] The danger of dioxin is illustrated by the fact that the maximum contaminant level for dioxin in drinking water is 30 picograms—30 trillionths of a gram—per liter.[17]

The process that International Paper used to make paper created a great deal of waste, including sludge-filled waste water.[18] The Pasadena mill "used 26 million gallons of water every day."[19] As early as the mid-1950s, International Paper needed a way to dispose of its

---

[13] 63 RR 38.

[14] Id.

[15] 63 RR 40.

[16] OPX 11 at 6. This statement comes from an EPA report that the trial court excluded from evidence at trial. 74 RR 53-54, 57.

[17] 40 C.F.R. § 141.61(c)(33); 63 RR 149.

[18] 63 RR 51-52.

[19] 63 RR 51.

sludge.[20]  In 1965, International Paper decided to dump its sludge in open pits on the bank of the San Jacinto River in Harris County, Texas (the "Pits").[21]  International Paper chose a location on the west bank of the San Jacinto River, just north of where Interstate 10 crosses the River (the "Site").[22]

International Paper hired a company called McGinnes Industrial Maintenance Corp. ("MIMC") to barge the sludge from its Pasadena paper mill to the Site, but International Paper—through its contract with MIMC—retained control over the dumping.[23]  The contract specified that the sludge would be dumped at "a tract of land acceptable to" International Paper.[24]  The contract specified that the sludge would

---

[20] PX 43; see also PX 17 at 2 (by 1966, International Paper created a barge load of sludge per day).

[21] PX 17.

[22] Id. at 5; 64 RR 188.

[23] International Paper initially hired a company called the Ole Peterson Construction Co., Inc. to dump the sludge in the Pits at the Site in April 1965.  DX 1436.  Ole Peterson soon ran into financial difficulties, and the contract was assigned to MIMC in August 1965.  PX 128; 68 RR 13, 43-44.  At trial, there was a dispute as to who owned the Site.  MIMC contended that it did not actually own the Site, but that the Site was instead owned by its owner Virgil McGinnes.  See, e.g., 68 RR 55-61.  Harris County provided documents from Virgil McGinnes and his heirs stating that the site was owned by MIMC.  CX 4; 57 CR 32303-32312.  The trial court ultimately ruled that, as a matter of law, Virgil McGinnes and his heirs owned the Site.  62 CR 34702.

[24] DX 1436 at 1.

3

be transported by barge.[25]  The contract required MIMC to have all necessary permits and licenses and to comply with all laws, rules, and regulations.[26]  International Paper required MIMC to perform the work "in a good and workmanlike manner."[27]  International Paper also had the right to audit MIMC's records.[28]  International Paper even withheld 15% of the contract payment to make sure that MIMC paid for all of its labor, material, and equipment costs.[29]

International Paper had MIMC pick up the sludge in its barges, transport the sludge to the Site, and dump the sludge in the Pits.[30]  After the sludge—which was mixed with water so that it could be transported more easily—settled in the Pits, the remaining water from the sludge/water slurry was barged back to International Paper's paper mill.[31]

---

[25] Id.

[26] Id. at 6; 68 RR 18.

[27] DX 1436 at 6; 68 RR 18.

[28] DX 1436 at 6.

[29] Id. at 2.

[30] PX 17; 68 RR 41.

[31] 70 RR 110-111, 119-120; PX 17 at 3.

4

Between 1965 and 1966, International Paper dumped between 125,000 and 130,000 cubic yards of sludge in the Pits.[32] That is the equivalent of filling 38 olympic-sized swimming pools with sludge.[33] The only waste dumped at the Site was International Paper's sludge from its Pasadena paper mill.[34]

**The Pits failed, releasing dioxin into the San Jacinto River.**

The Pits were dug into the soil, with dirt piled up to create walls known as levees or berms.[35] The Pits were not covered.[36] The Pits were not lined, so there was nothing separating the sludge from the ground.[37] There was conflicting evidence on the properties of the soil underneath the sludge. Some evidence showed that the soil was made of clay.[38] But Harris County provided evidence showing that the soil had a low clay

---

[32] 63 RR 48. The dumping took place between September 1965 and May 1966. 68 RR 14.

[33] 63 RR 48.

[34] 68 RR 14, 51; 70 RR 120.

[35] PX 16; PX 17 at 1; 63 RR 46.

[36] PX 17; 71 RR 15.

[37] 71 RR 25-26.

[38] PX 30; 70 RR 134.

5

content, which meant that the soil did not create an impermeable barrier.[39]

At the beginning of the disposal, Harris County officials stressed that the sludge could not be allowed to enter the San Jacinto River.[40] Harris County's Pollution Control Director reiterated that the "waste handling operation should be done in a manner which would not allow any liquid waste to leave the property and escape into the river."[41] He made clear that protecting the River "would require some careful handling."[42]

The Pits began to fail soon after they were constructed. By the end of 1965—just months after the dumping began—International Paper learned that "heavy rains had washed away a portion of the outside slope so that the top of the levee had been reduced to about one-half its original width at two points."[43] A 1966 inspection reflected that the Pits were already showing signs of seepage.[44]

---

[39] 63 RR 121-122, 127-130, 134.

[40] PX 30

[41] Id.; 63 RR 78.

[42] PX 30.

[43] PX 16 at 1.

[44] PX 17 at 2.

6

Internal MIMC documents show that by mid-1968, the Pits were "completely filled with waste materials and could no longer serve as a dump site."[45] MIMC's board of directors determined that the sludge in the Pits made the land where the Pits were located "worthless."[46] In August 1968, MIMC's board of directors officially determined that the Pits would "be abandoned as a dump site" and that the land, which had cost $50,000 to purchase, was now worth "the nominal sum of $1."[47]

No further maintenance was ever done on the Pits after they were abandoned in 1968.[48]

Aerial photos show that there was a breach of the levees in 1973.[49] With that breach, water from the San Jacinto River entered the Pits.[50] That breach was never repaired; instead, it actually grew larger over

---

[45] PX 143 at 4.

[46] Id.

[47] Id. at 4.

[48] 63 RR 115, 142; 66 RR 34; 68 RR 49-51, 61.

[49] 63 RR 109.

[50] 65 RR 162.

time.[51] Once the Pits were partially covered with water, the dioxin in the sludge would release into the water daily.[52]

Surveyor reports show that by July 1, 1989, most of the Pits were submerged under water.[53] Those parts of the Pits remained submerged through at least March 30, 2008 (the end of the period at issue in this lawsuit).[54] The Site was approximately twenty acres, and only four or five acres remained above water.[55] So approximately 75% of the Site was submerged under water as of mid-1989, allowing the dioxin in the sludge to release into the water daily.[56] In addition, the area of the San Jacinto River around the Pits is influenced by the tides, and the action

---

[51] 65 RR 162 ("[F]rom '73 onward all the way into the 2000s, the breach was there and it stayed there and it enlarged through time.").

[52] 63 RR 116; 66 RR 37. Dioxin is "hydrophobic," which means it does not readily dissolve in water. 63 RR 146. But it would still partially dissolve in water. 63 RR 146, 155, 157. In addition, the dioxin would become attached to microscopic particles—known as colloids—which would leave the Pits and enter the water. 63 RR 116, 155. So once the Pits were covered with water, the dioxin-contaminated colloids would readily leave the Pits and enter the surrounding water. Id.

[53] PX 1005; 63 RR 107-108; 65 RR 163.

[54] 63 RR 107-108. Harris County ended its claim for civil penalties as of March 30, 2008. 1 SCR 67-68.

[55] 63 RR 109.

[56] Id.; 65 RR 164 ("[T]here is no question in my mind that there were releases of dioxin coming out of these—these pits. They're in direct connection now, inundation from the river on a daily basis, subject to wind, tide, flood, all of that.").

of the tides caused more movement of dioxin from at least the time the Site was submerged in mid-1989.[57]

Testing of the San Jacinto River showed that "by far and away the highest" amount of 2,3,7,8-TCDD was near the Pits, with the dioxin levels lowering the farther one went from the Pits.[58] The Pits, therefore, were the dioxin "hot spot," meaning they were the source of the dioxin.[59] As Harris County's expert hydrologist explained, "you are getting these very hot samples, much higher concentrations in and around and close to the pit, and then significantly decreasing as we go upstream or downstream."[60] That leads to the conclusion that "dioxin from inside the impoundments got outside the impoundments."[61]

There was evidence that dredging in the area by a third party also caused damage to the Pits in the 1990s.[62] A dredging barge was conducting sand-mining activities in the area near the Site, and it

---

[57] 65 RR 164-166. The trial court ruled that the jury could not "consider whether tidal action had any impact at the site before July 1st of 1989." 66 RR 20.

[58] 66 RR 26-28.

[59] Id.

[60] 66 RR 30.

[61] 66 RR 29-30.

[62] 70 RR 169-174, 195-196.

appears that the dredging machine accidentally dug into the Pits.[63]

Harris County, however, provided evidence that dredging was not the sole source of the dioxin in the San Jacinto River.[64] And dredging would not have caused dioxin contamination before the 1990s.[65]

**The EPA designated the Pits as a Superfund site in 2008 because of dioxin contamination from the sludge.**

In 2008, the EPA listed the Site as a Superfund site because of the dioxin contamination."[66] The EPA ordered International Paper and MIMC to construct a temporary cap over the Site to prevent ongoing releases of dioxin.[67] This lawsuit does not involve claims for violations that took place after the EPA listed the Site as a Superfund site.[68]

The EPA is currently considering the appropriate permanent remedy that will prevent the dioxin from seeping into the San Jacinto River in the future.[69]

---

[63] 70 RR 169-174. It appears that the dredging that cut into the Pits took place around 1996 or 1997. 70 RR 205-206.

[64] 66 RR 75.

[65] 70 RR 205-206.

[66] 62 RR 10-11 (App. H).

[67] 8 CR 4735.

[68] 1 SCR 67-68.

[69] 8 CR 4736.

**Harris County sued International Paper for civil penalties because the company caused, suffered, allowed, or permitted violations of Texas environmental laws.**

In December 2011, Harris County sued International Paper, MIMC, and MIMC's corporate parents Waste Management, Inc. and Waste Management of Texas, Inc. for civil penalties based on their violation of Texas environmental laws.[70]

The Texas Water Code imposes civil penalties on those who "cause, suffer, allow, or permit" violations of Texas environmental laws or Texas Commission on Environmental Quality ("TCEQ") rules.[71] The civil penalty is between $50 and $25,000 per day per violation, "as the court or jury considers proper," and "[e]ach day of a continuing violation is a separate violation."[72]

The Texas Water Code allows local governments to sue for civil penalties for violations that occur in their jurisdiction.[73] The TCEQ is "a necessary and indispensable party" to the suits brought by local

---

[70] 1 CR 73.

[71] TEX. WATER CODE § 7.101; TEX. WATER CODE § 7.102. Texas environmental laws have been amended several times over the past decades, but since at least 1961 it has been illegal to cause or allow the discharge of pollution into the waters of the State without a permit. Acts 1961, 57th Leg. 1st C.S., ch. 42, § 9.

[72] TEX. WATER CODE § 7.102.

[73] TEX. WATER CODE § 7.351(a).

governments.[74]   The civil penalties recovered are divided equally between the local government and the State.[75]

Harris County sued International Paper for violating the provision of the Texas Water Code that prohibits discharging industrial waste into, or adjacent to, the waters in the State without a permit.[76]  Harris County also sued International Paper for violating the provisions of the Texas Administrative Code that prohibit causing, suffering, allowing, or permitting the disposal of industrial solid waste in a manner that (1) causes the discharge, or imminent threat of discharge, of industrial solid waste into, or adjacent to, the waters in the State without a permit; (2) endangers the public health and welfare; or (3) causes the creation or maintenance of a nuisance.[77]

---

[74] TEX. WATER CODE § 7.353.

[75] Former TEX. WATER CODE § 7.107 (amended by Acts 2015, 84th Leg., ch. 542, § 1). Texas Water Code § 7.107 was amended in 2015 to limit the local governments' recovery to half of the first $4.3 million in civil penalties, with any amount above $4.3 million awarded to the State.  TEX. WATER CODE § 7.107.  This new provision applies only to violations that take place on or after September 1, 2015, so it does not apply to this case.  Acts 2015, 84th Leg., ch. 542, § 3.

[76] 1 SCR 67-69; TEX. WATER CODE § 26.121(a).

[77] 1 SCR 69-70; 30 TEX. ADMIN. CODE § 335.4.

**The trial court refused to allow evidence regarding the dangers of dioxin at trial.**

Because this case was about the effect of dioxin contamination on the public health and welfare, Harris County attempted to introduce evidence regarding the dangers of dioxin exposure.[78] The trial court, however, expressly refused to allow Harris County or the State to introduce "evidence related to dioxin's health effects, toxicology, and dangerousness."[79] The trial court prohibited any statement to the jury about the risk of harm from dioxin exposure except for the following stipulation: "[i]n July 1985, the EPA listed dioxin as a hazardous substance. As a result of its determination that dioxin may be harmful to the public health or the environment, the EPA listed the site as a Superfund site in 2008, due to the presence of dioxin."[80]

Harris County attempted to introduce Texas Department of Health Fish and Shellfish Consumption Advisories for the San Jacinto

---

[78] See OPX 3; OPX 7; OPX 15; OPX 18; OPX 19; 74 RR 47-60.

[79] 62 CR 34775 ("[T]he Court EXCLUDES evidence related to dioxin's health effects, toxicology, and dangerousness except as set forth in the parties' stipulation read to the jury at the beginning of trial") (first emphasis in original; second emphasis added); 62 CR 34777 (same); 62 CR 34793 (same).

[80] 62 RR 10-11 (App. H); 62 CR 34775; 62 CR 34777; 62 CR 34793.

River.[81]  The first advisory, which was issued in 1990, warned of the dangers of eating catfish and blue crabs because of the dioxin contamination.[82]  The second advisory, which was issued in 2001, warned of the dangers of eating any fish caught from "the San Jacinto River downstream of the U.S. Highway 90 bridge," which includes the area of the Pits.[83]  The trial court refused to admit the advisories.[84]

Harris County attempted to introduce a Texas Department of State Health Services' Public Health Assessment that specifically addressed public-health effects from exposure to dioxin at the Site.[85] The Public Health Assessment concluded that prolonged exposure to contaminated sediments from the Site could increase the risk of cancer.[86]  The Public Health Assessment stated that "[d]ioxins have been detected in sediments at the [Site] at levels that would possibly cause unacceptably high risks for cancer (greater than one out of 10,000

---

[81] 74 RR 57; OPX 15.

[82] OPX 15 at 3.

[83] Id. at 2.

[84] 74 RR 57.

[85] 74 RR 51-52; OPX 7.

[86] OPX 7 at 10.

people exposed)."[87]  The Public Health Assessment also concluded that "[c]onsuming fish or crabs caught near the [Site] for periods of one year or longer could harm people's health by increasing possible risks for cancer."[88]

The Public Health Assessment also addressed the dangers of dioxin in general.  It stated that the International Agency for Research on Cancer and the World Health Organization have listed 2,3,7,8-TCDD—the type of dioxin found in International Paper's sludge—as a Class 1 carcinogen, which means there is sufficient evidence that it is carcinogenic to humans.[89]  The Public Health Assessment also explained that exposure to dioxin can cause chloracne, which is a skin rash with acne-like lesions that occur mainly on the face, neck, and upper body.[90]  The trial court refused to admit the Public Health Assessment, or any reference to its existence, or any statement from the

---

[87] Id.

[88] Id. at 13-14.

[89] Id. at 40.

[90] Id. at 38.

International Agency for Research on Cancer about dioxin being a Class 1 carcinogen.[91]

Harris County attempted to introduce the EPA's Decision Document for the Time Critical Removal Action at the Site.[92] This EPA report discussed releases from the Site and the public-health hazards associated with the Site.[93] The trial court refused to admit the EPA report.[94]

Harris County attempted to introduce the EPA's Unilateral Administrative Order that required International Paper and MIMC to conduct a remedial investigation and feasibility study regarding the Site.[95] The EPA's order found that "[a] large portion of the ponds [at the Site] are continually inundated by the San Jacinto River and contaminated sediment within the source area are in direct contact with the river water."[96] The EPA's order also found that "[c]hemical analysis confirms that dioxin … contaminants are entering the San Jacinto

---

[91] 74 RR 51-52, 55.

[92] 74 RR 49; OPX 3.

[93] 74 RR 49; OPX 3.

[94] 74 RR 55.

[95] 74 RR 53-54; OPX 11.

[96] OPX 11 at 5.

River.  Chemical analysis documented the presence of numerous dioxin congeners in the source sediments."[97]  The EPA's order further found that "[b]oth human and ecological health is threatened by releases of hazardous substances from the [Site]."[98]

The EPA's order also found that 2,3,7,8-TCDD—the type of dioxin in International Paper's sludge—"is considered the most toxic of the dioxins."[99]  The EPA noted that the toxicities of other dioxins "are usually expressed as a fraction of the toxicity attributed to 2,3,7,8-TCDD."[100]  The EPA's order found that the "most common health effect in people exposed to large amounts of dioxins, in particular 2,3,7,8-TCDD, is chloracne."[101]  The EPA's order noted that the "World Health Organization has determined that 2,3,7,8-TCDD is a human carcinogen."[102]  The trial court refused to admit the EPA's order or the determination of the World Health Organization.[103]

---

[97] Id.

[98] Id. at 6.

[99] Id.

[100] Id.

[101] Id.

[102] Id. at 7.

[103] 74 RR 55.

Harris County also attempted to introduce testimony from several expert witnesses regarding the dangers of the dioxin contained at the Site, but the trial court excluded their testimony.[104] Harris County designated three experts on dioxin's dangers: Dr. Arnold Schecter, Dr. Wayne Snodgrass, and Dr. James Olson.[105] Dr. Schecter was a professor in the Environmental and Occupational Medicine Program at the University of Texas School of Public Health.[106] He has published over 100 scientific papers on dioxins in peer-reviewed scientific journals.[107] Dr. Snodgrass, a medical doctor with a PhD in pharmacology, is a professor in the Department of Pharmacology and Toxicology at the University of Texas Medical Branch, medical director of the Texas Poison Control Center—Houston/Galveston, and the past president of the American Academy of Clinical Toxicology.[108] Dr. Olson is a distinguished professor in the Department of Pharmacology and

---

[104] 62 CR 34775; 62 CR 34777; 62 CR 34793.

[105] 37 CR 21916.

[106] 2 SCR ___ (Harris County's Reply to Defendants' Motion to Exclude Drs. Olson, Schecter, and Snodgrass ("Harris County's Reply") at Ex. D) (filed Aug. 20, 2014).

[107] Id.

[108] 2 SCR ___ (Harris County's Reply at Exs. 271 & F).

Toxicology at the University of Buffalo School of Medicine.[109] For over 35 years, his research has concentrated on the pharmacokinetics and toxicology of dioxin and related compounds.[110] He has assisted the EPA in setting ambient water quality criteria for dioxin, and has written over 50 peer-reviewed studies on dioxin and related compounds.[111]

These witnesses would have provided evidence showing that:

- The International Agency for Research on Cancer—one of the primary scientific bodies for determining which substances cause cancer in humans—has determined that there is sufficient evidence that 2,3,7,8-TCDD can cause cancer in humans.[112]

- The United States Department of Health and Human Services' National Toxicology Program has determined that 2,3,7,8-TCDD can cause cancer in humans.[113]

- The World Health Organization has determined that 2,3,7,8-TCDD can cause cancer in humans.[114]

- Studies in humans have reported that low-level exposure to TCDD produces adverse female reproductive effects, changes in immune system

---

[109] 2 SCR ___ (Harris County's Reply at Exs. C & E).

[110] Id.

[111] Id.

[112] Id.

[113] 2 SCR ___ (Harris County's Reply at Ex. C).

[114] 2 SCR ___ (Harris County's Reply at Ex. D).

components, developmental dental defects, and diabetes.[115]

International Paper sought to exclude this testimony regarding the dangers of dioxin because the experts did not have epidemiological studies showing a doubling of the risk of specific cancers or other diseases.[116] International Paper argued that the Texas Supreme Court's ruling in Merrell Dow Pharmaceuticals, Inc. v. Havner applied in this government civil-penalty case.[117] Havner held that epidemiological studies showing a doubling of the risk of a disease are required to show causation in toxic-tort personal-injury cases.[118] Over Harris County's objections, the trial court granted International Paper's motions and excluded the testimony of Dr. Schecter, Dr. Snodgrass, and Dr. Olson and any other evidence of the harmful effects of dioxin, except for two sentences contained in the stipulation referenced above.[119]

---

[115] 2 SCR ___ (Harris County's Reply at Ex. C).

[116] 23 CR 14409, 14416-14425; 24 CR 15373, 15381-15388; 26 CR 16172, 16183-16196.

[117] Merrell Dow Pharm., Inc. v. Havner, 953 S.W.2d 706 (Tex. 1997); 23 CR 14409, 14416-14425; 24 CR 15373, 15381-15388; 26 CR 16172, 16183-16196.

[118] Havner, 953 S.W.2d at 714.

[119] 62 CR 34775; 62 CR 34777; 62 CR 34793. At trial, Harris County made an offer of proof regarding the testimony of Dr. Schecter, Dr. Snodgrass, and Dr. Olson. 74 RR 58-60. In its offer, Harris County adopted by reference the affidavits and deposition testimony contained in its response to the motions to exclude those

So in this case in which Harris County was seeking to establish that International Paper caused a threat to public health and welfare and a nuisance, the trial court excluded all evidence regarding dioxin's dangers, except for two sentences contained in the stipulation. The trial court ruled that the findings of the following agencies were junk science under Havner and not entitled to consideration by a Harris County jury: The Texas Department of Health, the United States Department of Health and Human Services' National Toxicology Program, the International Agency for Research on Cancer, the World Health Organization, and the United States EPA.[120]

**The trial court refused to submit to the jury questions on whether International Paper caused, suffered, allowed, or permitted a public endangerment or a nuisance.**

Neither International Paper, nor the other defendants, moved for directed verdict on Harris County's endangerment-of-public-health or nuisance claims, and the trial court did not dismiss those claims sua sponte. But even though Harris County pled those claims, and the

---

witnesses. 74 RR 59; see 37 CR 21916; 2 SCR ___ (Harris County's Reply at Exs. 271, 307, & C-F).

[120] 74 RR 55.

21

stipulation and other evidence supported those claims, the trial court refused to submit them to the jury.[121]

At the formal charge conference, Harris County requested that the trial court submit the endangerment-of-public-health and nuisance claims to the jury, but the trial court refused those requests.[122]  The record does not contain any explanation.

**The trial court instructed the jury that International Paper no longer owned its dioxin-contaminated paper-mill sludge after it was dumped in the Pits.**

International Paper claimed that even though it created the sludge as a byproduct of its papermaking process, it did not own the sludge when it was dumped in the Pits.[123]  There was no bill of sale or other document stating that the ownership of the sludge transferred from International Paper to another entity.  Instead, International Paper claimed that the ownership of the sludge either (1) passed to MIMC when MIMC picked the sludge up for disposal, or (2) passed to

---

[121] 63 CR 35172- 35199 (App. A).

[122] 63 CR 35097 (App. E); see also 63 CR 35127 (App. F).

[123] 34 CR 20513; 56 CR 31747; 57 CR 32187.

22

Virgil McGinnes, the owner of the Pits, when the sludge was dumped there, because it supposedly became a fixture of the real property.[124]

International Paper moved for summary judgment on the ground that it did not own the sludge and, therefore, could not have caused, suffered, allowed, or permitted the violations of environmental law related to the sludge.[125]  The trial court denied the motion, stating that there was a fact issue on who owned the sludge.[126]  Harris County tried its case to the jury based upon the trial court's determination that there was a fact issue on whether International Paper owned the sludge.[127]

After denying International Paper's summary-judgment and directed-verdict motions, the trial court changed its mind on this issue at the end of the case and instructed the jury in the charge that "as of 1966, [International Paper] no longer owned the waste."[128]  Harris County objected to that instruction on the ground that the ownership of the sludge after disposal was a disputed issue and that International

---

[124] 34 CR 20513; 56 CR 31747; 57 CR 32187.

[125] 34 CR 20513.

[126] 62 CR 34781; 62 CR 34784; 57 RR 123; 59 RR 8-10.

[127] See 62 RR 41 (Harris County told the jury during opening statement that International Paper "continued to own the sludge after delivering it to MIMC.").

[128] 63 CR 35177, 35183 (App. A).

23

Paper had not conclusively established that it ceased to own the sludge.[129] Harris County also requested that the trial court ask the jury questions regarding whether the sludge had become a fixture.[130] The trial court overruled Harris County's objections, refused its requests, and instructed the jury that International Paper did not own the sludge.[131]

### The other defendants settled at the end of the trial before closing arguments.

After the conclusion of the evidence—and right before closing arguments—Defendants Waste Management and MIMC settled with Harris County.[132] Harris County's claims against the defendants other than International Paper were severed into a separate cause of action, leaving International Paper as the only defendant.[133]

---

[129] 75 RR 12, 21. The formal charge conference was held before MIMC and Waste Management settled with Harris County. 75 RR 1-92. After the settlement, the trial court revised the jury charge to take out questions regarding MIMC and Waste Management. 76 RR 30. That shortened the jury charge from twenty questions to twelve. Id. The parties agreed that there was no need for a new formal charge conference and stipulated that the objections and requests at the formal charge conference would be considered having been made to the new-numbered questions in the revised jury charge. 76 RR 29-33.

[130] 63 CR 35113-35116 (App. G).

[131] 75 RR 12, 21; 63 CR 35113-35116 (App. G); 63 CR 35177, 35183 (App. A).

[132] 74 RR 46; 77 RR 5, 10.

[133] 77 RR 7; 62 CR 34704.

**The jury found for International Paper.**

In the jury charge, the trial court asked the jury two liability questions.[134]  In Question One, it asked the jury if International Paper:

> [C]aused, suffered, allowed or permitted the discharge of industrial waste containing dioxin into or adjacent to any water in the state at any time from February 15, 1973, until March 30, 2008.[135]

That question was based on Harris County's claim that International Paper violated the Texas Water Code.[136]  In Question Four, it asked the jury if International Paper:

> [C]aused suffered allowed, or permitted the handling or disposal of industrial solid waste containing dioxin in such a manner so as to cause the discharge or imminent threat of discharge of industrial solid waste containing dioxin into or adjacent to the water in the State from December 31, 1975, until March 30, 2008.[137]

That question was based on Harris County's claim that International Paper violated the Texas Administrative Code.[138]

The jury answered "No" to both questions.[139]  The trial court entered final judgment consistent with the jury's verdict.[140]  The final

---

[134] 63 CR 35172-35199 (App. A).

[135] 63 CR 65177 (App. A).

[136] 1 SCR 67-69; TEX. WATER CODE § 26.121(a).

[137] 63 CR 65183 (App. A).

[138] 1 SCR 69-70; 30 TEX. ADMIN. CODE § 335.4.

judgment states that Harris County shall "recover nothing on all claims against Defendant International Paper Company."[141] Harris County filed a motion for new trial, which the trial court denied.[142]

## STANDARD OF REVIEW

The trial court is required "to submit requested questions to the jury if the pleadings and any evidence support them."[143] The Supreme Court has emphasized that the trial court has absolutely no discretion to disobey this requirement.[144] The issue of whether the charge submitted the controlling issues is a question of law, which this Court reviews de novo.[145]

This Court reviews the trial court's submission of a particular instruction for abuse of discretion.[146] An instruction is proper if it assists the jury, is supported by the pleadings or evidence, and

---

[139] 63 CR 65177, 65183 (App. A).

[140] Cf. 63 CR 35172-35199 (App. A) with 64 CR 35217-35222 (App. B).

[141] 64 CR 35220 (App. B).

[142] 64 CR 65226; 64 CR 35637 (App. C).

[143] Elbaor v. Smith, 845 S.W.2d 240, 243 (Tex. 1992); Tex. R. Civ. P. 278.

[144] Elbaor, 845 S.W.2d at 243 (referring to the requirement as "a substantive, non-discretionary directive to trial courts").

[145] Hamid v. Lexus, 369 S.W.3d 291, 295 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

[146] Shupe v. Lingafelter, 192 S.W.3d 577, 579 (Tex. 2006).

accurately states the law.[147]  The Supreme Court has held that "[c]harge error is generally considered harmful if it relates to a contested, critical issue."[148]

A trial court has "no discretion" in determining what the law is or in properly applying the law.[149]  This Court, therefore, reviews legal issues de novo, and the trial court automatically abused its discretion if it incorrectly interpreted, or improperly applied, the law.[150]  The trial court also abused its discretion if it acted in an arbitrary or unreasonable manner without reference to any guiding rules or principles.[151]

This Court reviews the trial court's decision to exclude evidence for abuse of discretion.[152]  A trial court's improper exclusion of evidence is reversible error if "the judgment turns on the particular evidence excluded."[153]

---

[147] Union Pac. R.R. Co. v. Williams, 85 S.W.3d 162, 166 (Tex. 2002).

[148] Thota v. Young, 366 S.W.3d 678, 687 (Tex. 2012).

[149] In re Dep't of Family & Protective Servs., 273 S.W.3d 637, 642 (Tex. 2009).

[150] Id. at 642-43.

[151] Walker v. Gutierrez, 111 S.W.3d 56, 62 (Tex. 2003).

[152] In re J.P.B., 180 S.W.3d 570, 575 (Tex. 2005).

[153] City of Brownsville v. Alvarado, 897 S.W.2d 750, 754 (Tex. 1995); see also Gulley v. Davis, 321 S.W.3d 213, 217 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

## SUMMARY OF ARGUMENT

The trial court erred when it refused to submit to the jury Harris County's issues on whether International Paper caused, suffered, allowed, or permitted an endangerment of the public health and welfare or a nuisance. Harris County pled those claims, so it was entitled to jury issues on them—and it was reversible error to not submit the issues—if the claims were supported by some evidence.

There is no dispute that International Paper, through its contract with MIMC, dumped dioxin-containing sludge in the Pits, and International Paper stipulated that the EPA has determined that dioxin is a hazardous substance. This evidence was sufficient to support jury issues on Harris County's endangerment-of-public-health and nuisance claims.

Because the trial court improperly excluded all of Harris County's evidence showing the dangers of dioxin, this Court should still reverse even if it determines that the admitted evidence was insufficient. The trial court erred in determining that the jury could not be permitted to consider the findings of the Texas State Department of Health, the EPA, the World Health Organization, and the International Agency for

28

Research on Cancer, and in excluding testimony from Harris County's three experts on dioxin's health effects. The trial court erred in determining that juries cannot consider evidence of adverse health effects unless those health effects double the risk to the public, as Havner requires for establishing causation in toxic tort cases.

The public-health and nuisance issues are independent of one another. So if this Court determines that the trial court erred in refusing to submit the public-endangerment issue, then it should reverse regardless of its determination of the nuisance issue. And, similarly, this Court should reverse if it determines that the trial court erred in refusing to submit the nuisance issue, regardless of its determination on the public-endangerment issue.

The trial court also erred when it changed its mind and instructed the jury that, as of 1966, International Paper no longer owned the sludge that it dumped in the Pits. There is no dispute that it was International Paper's sludge—and only International Paper's sludge—that was dumped in the Pits. And International Paper did not identify any document showing that it ever transferred the ownership of its sludge. International Paper, therefore, had to conclusively establish

29

that the ownership of its sludge passed to another person or entity by operation of law. International Paper did not meet its burden. Because the ownership of the sludge was a contested, critical issue, the trial court's improper instruction was reversible, harmful error.

Each of these grounds is sufficient—by itself—to reverse the trial court's judgment and remand for retrial. On behalf of the people of Harris County, the County should be permitted to try its entire case to the jury, not the erroneously abridged version of that case that the trial court permitted.

## ARGUMENT

This Court should reverse the judgment and remand this case for retrial because the trial court (1) improperly refused to submit to the jury Harris County's claims of endangerment of the public health and welfare and for nuisance, and (2) improperly instructed the jury that International Paper ceased owning the sludge as of 1966.

**I.    The trial court erred when it refused to submit to the jury Harris County's claims for endangerment of the public health and for nuisance.**

Harris County's pleadings included claims that International Paper caused, suffered, allowed, or permitted (1) the endangerment of the public health and welfare,[154] and (2) the creation and maintenance of a nuisance.[155]   Harris County provided evidence supporting those claims and requested jury issues on them.[156]   The trial court, therefore, was required to submit those issues to the jury.[157]

The trial court erred when it refused to submit these issues.[158] This Court, therefore, should reverse the judgment and remand for a retrial that includes the issues of endangerment of the public health and welfare, as well as nuisance.

**A.    The trial court erred when it refused to submit Harris County's claim for endangerment of the public health.**

The Texas Administrative Code expressly prohibits causing, suffering, allowing, or permitting the handling or disposal of industrial

---

[154] 1 SCR 69-70; 30 TEX. ADMIN. CODE § 335.4(3).

[155] 1 SCR 69-70; 30 TEX. ADMIN. CODE § 335.4(2).

[156] See §§ I(A)-(B) below; 63 CR 35097-35098 (App. E); 63 CR 35127 (App. F).

[157] Elbaor, 845 S.W.2d 243.

[158] 63 CR 35172-35199 (App. A); 63 CR 35097-35098 (App. E); 63 CR 35127 (App. F).

31

solid waste in a manner that causes "the endangerment of the public health and welfare."[159]  There is no question that International Paper caused the disposal of industrial solid waste in the Pits.

The Texas Administrative Code defines "industrial solid waste" as "solid waste resulting from or incidental to any process of industry or manufacturing."[160]  The Texas Administrative Code states that "solid waste" includes "discarded material, including solid, liquid, [or] semisolid … materials resulting from industrial … operations."[161]

International Paper admitted that:

- The sludge was waste created as a result of International Paper's papermaking process;[162]

- Its sludge was dumped in the Pits; and[163]

- The only waste ever dumped in the Pits was the sludge from its paper-mill operations.[164]

---

[159] 30 TEX. ADMIN. CODE § 335.4(3).

[160] 30 TEX. ADMIN. CODE § 335.1(80).

[161] 30 TEX. ADMIN. CODE § 335.1(140).

[162] 65 RR 36-37; 68 RR 14; see also 63 RR 71 (International Paper's paper-mill sludge is "industrial waste").

[163] 65 RR 36-37; 68 RR 14.

[164] 68 RR 14; 68 RR 51; 70 RR 120.

Because the sludge was discarded material that resulted from International Paper's industrial process, it is—by definition—industrial solid waste.[165]

The operative question, then, is whether there is evidence that the sludge at the Pits endangered the public health and welfare. This Court can easily answer that question because International Paper stipulated at the beginning of trial that it did.[166]

International Paper admitted that the sludge it dumped in the Pits contained dioxin.[167] International Paper stipulated that "[i]n July 1985, the EPA listed dioxin as a hazardous substance" and determined that "dioxin may be harmful to the public health or the environment."[168] The trial court stated that the stipulation was evidence of dioxin's "dangerousness."[169]

---

[165] 30 TEX. ADMIN. CODE § 335.1(80).

[166] 62 RR 9-11 (App. H).

[167] 70 RR 178.

[168] 62 RR 10-11 (App. H). The trial court based its decision to exclude extensive evidence on the dangers of dioxin in part on the fact that International Paper and the other defendants had stipulated that the EPA had determined that dioxin was dangerous. 62 CR 34775; 62 CR 34777; 62 CR 34793; 74 RR 58.

[169] 62 CR 34775 (the trial court stated that it was excluding "evidence related to dioxin's … dangerousness except as set forth in the parties' stipulation") (emphasis added); 62 CR 34777 (same); 62 CR 34793 (same).

A stipulation "is an agreement, admission, or concession made in a judicial proceeding by the parties relating to matters incident to the proceedings."[170]  A stipulation "obviates the need for proof on a litigable issue."[171]  This Court has held that a "stipulation constitutes a binding contract between the parties and the court."[172]

International Paper's stipulation that the EPA designated dioxin as a "hazardous substance" is some evidence that dioxin is a danger to public health.[173]  Harris County, therefore, was entitled to the submission on this issue, and the trial court erred when it refused to submit the issue to the jury.  The trial court's refusal to submit an issue supported by the pleadings and evidence is reversible error, requiring reversal of the judgment and remand for retrial.[174]

---

[170] Hansen v. Academy Corp., 961 S.W.2d 329, 335 (Tex. App.—Houston [1st Dist.] 1997, writ denied).

[171] Id.

[172] Rosenboom Mach. & Tool, Inc. v. Machala, 995 S.W.2d 817, 820 (Tex. App.—Houston [1st Dist.] 1999, pet. denied).

[173] 62 RR 10-11 (App. H).

[174] Hiles v. Arnie & Co., 402 S.W.3d 820, 830 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) ("If there is some evidence to support the submission, the trial court commits reversible error if it fails to submit the instruction.").

**B.    The trial court erred when it refused to submit Harris County's claim for nuisance.**

Equally important as Harris County's claim that International Paper endangered public health and welfare, is Harris County's claim that International Paper created a nuisance. The Texas Administrative Code also prohibits causing, suffering, allowing, or permitting the handling or disposal of industrial solid waste in a way that causes "the creation and maintenance of a nuisance."[175]  A nuisance is "a condition that amounts to an unreasonable interference with a right common to the general public."[176]

Harris County pled and introduced evidence that International Paper violated this provision of the Texas Administrative Code by creating and maintaining a nuisance, entitling it to a jury issue.[177]  The trial court erred when it refused to submit the nuisance issue to the jury.  This Court, therefore, should reverse the judgment on this basis and remand for retrial.

---

[175] 30 TEX. ADMIN. CODE § 335.4(2).

[176] In re Premcor Ref. Group, Inc., 233 S.W.3d 904, 907 (Tex. App—Beaumont 2007) (orig. proceeding); Jamail v. Stoneledge Condominium Owners Ass'n, 970 S.W.2d 673, 676 (Tex. App.—Austin 1998, no pet.); RESTATEMENT (SECOND) OF TORTS § 821B(1).

[177] 1 SCR 69-70; see §§ I(B)(1)-(2) below; Elbaor, 845 S.W.2d at 243.

## 1. International Paper's stipulation is evidence that the dioxin in the Pits created a nuisance.

International Paper's stipulation that dioxin is a hazardous substance is also sufficient evidence that it created a nuisance. With that stipulation, International Paper agreed that the sludge that it dumped in the Pits contains a "hazardous substance" that is "harmful to the public health or the environment."[178]

The contamination with a hazardous substance creates "a condition that amounts to an unreasonable interference with a right common to the general public," which is the definition of a nuisance.[179] Dumping sludge that contains dioxin, a hazardous substance, into pits that slide beneath the surface of the San Jacinto River is the creation of a nuisance. The trial court, therefore, erred when it refused to submit the nuisance issue to the jury.

## 2. There is sufficient evidence in the record regarding nuisance in addition to International Paper's stipulation.

Even if this Court were to hold that the stipulation was not sufficient evidence, there is additional evidence that International

---

[178] 62 RR 10-11 (App. H).

[179] In re Premcor Ref., 233 S.W.3d at 907; Jamail, 970 S.W.2d at 676; RESTATEMENT (SECOND) OF TORTS § 821B(1).

36

Paper created a nuisance. The trial court, therefore, erred when it refused to submit the nuisance issue to the jury.

There has been extensive dredging of the San Jacinto River in the area of the Site, including dredging for sand-mining purposes.[180] The fact that the Pits—which International Paper admits are contaminated with its dioxin—are now under the San Jacinto River greatly limits the ability of the public to dredge in that area of the River.[181] International Paper itself contends that dredging near the Site accidentally cut into the Pits, releasing dioxin into the River.[182] The dioxin contamination caused the Army Corps of Engineers to suspend dredging operations near the Site.[183] The dioxin in the sludge that International Paper dumped in the Pits, therefore, has curtailed the ability to dredge and mine sand in the area. That alone is evidence that International Paper created a nuisance.[184]

---

[180] 70 RR 175-176.

[181] PX 1005; 70 RR 178; 71 RR 26.

[182] 70 RR 173, 177-178; 71 RR 27-28.

[183] 70 RR 73, 177-178.

[184] In re Premcor Ref., 233 S.W.3d at 907; Jamail, 970 S.W.2d at 676; RESTATEMENT (SECOND) OF TORTS § 821B(1).

It has long been held that pollution interfering with fishing is a nuisance.[185] Harris County provided evidence that people fished at the Site.[186] The contamination of the Site with dioxin, which the EPA has found to be a hazardous substance, interferes with the public's ability to fish at the Site.[187] That alone created a nuisance.

Because most of the Site has been inundated by the San Jacinto River since mid-1989, those portions of the Site are now part of the San Jacinto River, which means that the riverbed of the San Jacinto River is now contaminated with dioxin.[188] Because portions of the Pits are now part of the San Jacinto River's riverbed, the ownership of those portions of the Pits passed from private hands to the public.[189] The public's ability to make use of that portion of the riverbed has been extremely

---

[185] RESTATEMENT (SECOND) OF TORTS § 821B(1) cmt. g; Texas Gulf Sulphur Co. v. State, 16 S.W.2d 408, 410-11 (Tex. Civ. App.—Galveston 1929, no writ); State ex rel. Wear v. Springfield Gas & Elec. Co., 204 S.W. 942, 945-46 (Mo. 1918).

[186] 64 RR 189-194.

[187] 62 RR 10-11 (App. H).

[188] PX 1005; 63 RR 107-108; 65 RR 163.

[189] TH Inv., Inc. v. Kirby Inland Marine, LP, 218 S.W.3d 173, 182-84 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).

curtailed because of the dioxin contamination.[190]  That alone is evidence that International Paper created a nuisance.[191]

Because Harris County provided evidence that International Paper caused, suffered, allowed, or permitted the creation or maintenance of a nuisance, the trial court erred when it refused to submit the nuisance issue to the jury.

### C. The trial court erred when it excluded evidence on endangerment and nuisance.

International Paper may argue that the stipulation and other evidence were insufficient to support a jury submission on endangerment of the public health and welfare or nuisance.  While Harris County disagrees with that argument as explained above, this Court should order a retrial even if it were to determine that the evidence on these issues was insufficient.

A court cannot improperly exclude evidence on an issue and then penalize a party for failing to provide evidence on that issue.  This Court, therefore, should grant a retrial based on the trial court's

---

[190] 62 RR 10-11 (App. H).

[191] In re Premcor Ref., 233 S.W.3d at 907; Jamail, 970 S.W.2d at 676; RESTATEMENT (SECOND) OF TORTS § 821B(1).

improper exclusion of the evidence regarding dioxin's dangers to public health and of nuisance.

### 1. The trial court erred when it excluded the government reports on dioxin's health risks.

Much of the excluded evidence came from reports prepared by the United States and Texas governments regarding the Site.[192] Under Texas Rule of Evidence 803(8), government reports setting out "factual findings from a legally authorized investigation" are admissible unless "the source of information or other circumstances indicate a lack of trustworthiness."[193] Pursuant to Rule 803(8), these government reports were admissible regardless whether Havner applies in government civil-penalty cases because they are not expert testimony.[194]

International Paper did not establish that the EPA and Texas State Department of State Health Services reports were not trustworthy. And these government reports were relevant because they related directly to the issue of dioxin's dangerousness.[195] The trial court, therefore, erred when it excluded the evidence from the

---

[192] OPX 3; OPX 7; OPX 11; 74 RR 47-58.

[193] TEX. R. EVID. 803(8).

[194] Havner, 953 S.W.2d at 713-14.

[195] TEX. R. EVID. 401.

government reports because they were admissible under Texas Rule of Evidence 803(8) as government reports setting out "factual findings" from "legally authorized investigation[s]."[196]

### 2. The trial court erred in using *Havner* to determine the admissibility of evidence regarding dioxin's health risks.

Harris County attempted to introduce evidence from its experts Dr. Schecter, Dr. Snodgrass, and Dr. Olson to show the dangers of dioxin.[197] International Paper objected that the evidence of dioxin's dangers was not admissible under the Texas Supreme Court's ruling in Merrell Dow Pharmaceuticals, Inc. v. Havner because the studies did not show a doubling of the risk of cancers and other conditions.[198] The trial court excluded the evidence of dioxin's dangers based on International Paper's objection.[199]

The trial court erred in excluding the evidence of dioxin's dangers because Havner does not limit the admissibility of evidence regarding the general dangerousness of a substance in an environmental civil-

---

[196] TEX. R. EVID. 803(8).

[197] See OPX 3; OPX 7; OPX 15; OPX 18; OPX 19; 74 RR 47-60.

[198] Havner, 953 S.W.2d 706; 23 CR 14409, 14416-14425; 24 CR 15373, 15381-15388; 26 CR 16172, 16183-16196.

[199] 62 CR 34775; 62 CR 34777; 62 CR 34793.

penalty case brought by the government.  Instead, Havner's doubling-of-the-risk requirement applies in toxic-tort cases where a plaintiff is seeking to hold a defendant liable for causing a specific injury to the plaintiff.  Harris County did not attempt to link dioxin to any specific person's injury in an attempt to recover damages for that injury, so Havner does not apply.

In a tort case, the question is whether the defendant's conduct caused the plaintiff's injury.[200]  The plaintiff cannot prevail unless he can show that it is more likely than not that the defendant's conduct caused his injury.[201]  In Havner, the Supreme Court addressed how this well-recognized more-likely-than-not rule plays out in the toxic-tort context.[202]  The Supreme Court held that a plaintiff could not show that it was more likely than not that the defendant's product caused his injury unless the scientific studies showed that exposure to the defendant's product more than doubled the risk of the injury.[203]

---

[200] Bostic v. Georgia-Pac. Corp., 439 S.W.3d 332, 342-43 (Tex. 2014).

[201] Id.; Parker v. Employers Mut. Liab. Ins. Co., 440 S.W.2d 43, 47 (Tex. 1969).

[202] Havner, 953 S.W.2d at 714 (noting that the case was addressing "proof of causation in a toxic tort case") (emphasis added).

[203] Id. at 714-20.

The Supreme Court has repeatedly held that Havner applies in toxic-tort cases.[204] But there are no cases that have held that Havner applies when the government is seeking to impose civil penalties for violating environmental laws. And there are certainly no cases holding that Havner applies when the government is seeking to impose civil penalties for endangering the public health or creating a nuisance.

The fact that Havner's doubling-of-the-risk requirement does not apply is apparent from the Supreme Court's explanation of its holding. In explaining the importance of the doubling-of-the-risk requirement in Havner, the Supreme Court said:

> Assume that a condition naturally occurs in six out of 1,000 people even when they are not exposed to a certain drug. If studies of people who did take the drug show that nine out of 1,000 contracted the disease, it is still more likely than not that causes other than the drug were responsible for any given occurrence of the disease since it occurs in six out of 1,000 individuals anyway. Six of the nine incidences would be statistically attributable to causes other than the drug, and therefore, it is not more probable that the drug

---

[204] See, e.g., Borg-Warner Corp. v. Flores, 232 S.W.3d 765, 772 (Tex. 2007); BIC Pen Corp. v. Carter, 346 S.W.3d 533, 545 (Tex. 2011) (holding that Havner applies in toxic-tort cases and refusing to apply Havner to manufacturing-defect product-liability cases). The Supreme Court has also applied Havner in pharmaceutical cases when the issue is whether epidemiological evidence shows that the defendant's drug caused the plaintiff's injury, which is in many ways similar to the inquiry in toxic-tort cases. See Merck & Co. v. Garza, 347 S.W.3d 256, 265-66 (Tex. 2011).

caused any one incidence of disease. This would only amount to evidence that the drug could have caused the disease. However, if more than twelve out of 1,000 who take the drug contract the disease, then it may be statistically more likely than not that a given individual's disease was caused by the drug.[205]

The doubling-of-the-risk requirement, therefore, is based on the need in toxic-tort cases to show that it is more likely than not that the defendant's product caused the specific plaintiff's particular injury.

By contrast, in an environmental civil-penalty case brought by the government, the question of whether the defendant's waste caused a particular person to contract a particular disease is not an issue. Instead, the question is whether the defendant violated Texas environmental laws by endangering the public health and creating a nuisance and, if so, the amount of civil penalties that should be assessed.[206] Instead of attempting to recover damages based on injuries to a specific plaintiff, in a civil-penalty case the government is seeking to deter dangerous conduct.

In addition, the Supreme Court has held that Texas environmental laws should be interpreted "liberally to give effect to

---

[205] Havner, 953 S.W.2d at 717; see also Bostic, 439 S.W.3d at 349.

[206] TEX. WATER CODE § 7.101; TEX. WATER CODE § 7.102.

[their] remedial purpose[s]."[207]  Applying Havner's doubling-of-the-risk requirement in environmental civil-penalty cases brought by the government is contrary to the Supreme Court's command, as well as the statutory and regulatory language upon which Harris County litigated its case.

This Court, therefore, should make clear that Havner's doubling-of-the-risk requirement does not apply when the government is seeking to show the dangers of pollution in environmental civil-penalty cases. This Court should use this case to make clear to trial courts that while Havner is extremely important when determining causation in toxic-tort cases, it does not apply to environmental civil-penalty cases brought by the government.

---

[207] R.R. St. & Co. v. Pilgrim Enter., 166 S.W.3d 232, 238 (Tex. 2005).

**3. Harris County provided evidence that International Paper's dumping of the dioxin-laced sludge in the Pits endangered the public health and created a nuisance.**

The trial court erroneously excluded Harris County's offered testimony and documentary evidence showing the dangers of dioxin.[208] This evidence includes:

- The International Agency for Research on Cancer—one of the primary scientific bodies for determining which substances cause cancer in humans—has determined that there is sufficient evidence that 2,3,7,8-TCDD can cause cancer in humans.[209]

- The United States Department of Health and Human Services' National Toxicology Program has determined that 2,3,7,8-TCDD can cause cancer in humans.[210]

- The World Health Organization has determined that 2,3,7,8-TCDD can cause cancer in humans.[211]

- Texas Department of State Health Services issued a Public Health Assessment that specifically addressed the Site.[212] The Public Health Assessment concluded that prolonged exposure to

---

[208] 74 RR 51-60; 62 CR 34775; 62 CR 34777; 62 CR 34793; OPX 3; OPX 7; OPX 11; OPX 15; see pp. 13-20 above.

[209] 2 SCR ___ (Harris County's Reply at Ex. C); OPX 7 at 40.

[210] 2 SCR ___ (Harris County's Reply at Ex. C).

[211] 2 SCR ___ (Harris County's Reply at Ex. D).

[212] OPX 7 at 10.

contaminated sediments from the Site could increase the risk of cancer.[213] The Public Health Assessment stated that "[d]ioxins have been detected in sediments at the [Site] at levels that would possibly cause unacceptably high risks for cancer (greater than one out of 10,000 people exposed)."[214]

- The EPA found that "[b]oth human and ecological health is threatened by releases of hazardous substances from the [Site]."[215]

- The Texas Department of Health issued Fish and Shellfish Consumption Advisories for the San Jacinto River.[216] The first advisory, which was issued in 1990, warned of the dangers of eating catfish and blue crabs because of the dioxin contamination.[217] The second advisory, which was issued in 2001, warned of the dangers of eating any fish caught from "the San Jacinto River downstream of the U.S. Highway 90 bridge," which includes the area of the Pits.[218]

The trial court erred when it excluded the evidence based on Havner's doubling-of-the-risk requirement because that requirement does not apply in this government civil-penalty case.[219]

---

[213] Id.

[214] Id.

[215] OPX 11 at 6.

[216] 74 RR 57; OPX 15.

[217] OPX 15 at 3.

[218] Id. at 2.

[219] See § I(C)(2) above.

**4. The trial court's improper exclusion of the evidence regarding the dangers of dioxin was reversible error.**

A trial court's rulings on the admissibility of evidence ordinarily do not rise to the level of reversible error. But the Supreme Court has made clear that a trial court's improper exclusion of evidence is reversible error if "the judgment turns on the particular evidence excluded."[220] That is the situation here.

Harris County was entitled to the submission to the jury of the issues on endangerment of public health and nuisance if there was evidence supporting those claims.[221] If this evidence had been admitted, then there would clearly be evidence that the sludge endangered the public and created a nuisance.[222] So if this Court determines that the evidence introduced—including the stipulation— was insufficient to support submissions on those issues, then "the judgment turns" on the exclusion of the evidence regarding dioxin's dangers.[223]

---

[220] Alvarado, 897 S.W.2d at 754; see also Gulley v. Davis, 321 S.W.3d 213, 217 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

[221] Elbaor, 845 S.W.2d at 243.

[222] See § I(C)(3) above.

[223] If this Court determines that the evidence was sufficient to support the submission of those issues, then it will reverse on that basis and will not need to

Therefore, the trial court's erroneous exclusion of the evidence regarding dioxin's dangers was reversible error.

## D. The endangerment and nuisance issues are not "functionally identical" to the submitted discharge question.

International Paper has argued that the trial court did not have to submit the public-endangerment and nuisance issues because those issues allegedly involved the same factual determination as the issues that the trial court did submit.[224] International Paper is wrong. Harris County's requested issues on public endangerment and nuisance were different than the issues that the trial court submitted, so the trial court erred when it refused to submit Harris County's requested public-endangerment and nuisance issues.

A trial court does not have to submit an issue when the requested issue is "functionally identical" to a submitted issue.[225] Texas Rule of Civil Procedure 278 describes the exception as not requiring "other and

reach the issue of whether the trial court's exclusion of the evidence was reversible error. Even though this Court will not need to address whether the exclusion was reversible error in that circumstance, it should still address the trial court's exclusion of that evidence because the evidence's admissibility will be a major issue on retrial and may affect not just the liability determinations, but also the amount of penalties.

[224] 64 CR 35614-35617.

[225] Hyundai Motor Co. v. Rodriguez, 995 S.W.2d 661, 665-66 (Tex. 1999).

49

various phases or different shades of the same question."[226]  This Court

has interpreted Rule 278's exception as not requiring "additional issues

or instructions that are mere shades or variations of the issues already

submitted."[227]

Rule 278's exception does not apply here because Harris County's

requested issue on public endangerment was not functionally identical

to issues that were submitted in the charge.

The jury was asked in Question One if International Paper:

> [C]aused, suffered, allowed or permitted the discharge
> of industrial waste containing dioxin into or adjacent to
> any water in the state at any time from February 15,
> 1973, until March 30, 2008.[228]

The jury was asked in Question Four if International Paper:

> [C]aused, suffered, allowed, or permitted the handling
> or disposal of industrial solid waste containing dioxin
> in such a manner as to cause the discharge or
> imminent threat of discharge of industrial solid waste
> containing dioxin into or adjacent to the water in the
> State at any time from December 31, 1975, until March
> 30, 2008?[229]

---

[226] TEX. R. CIV. P. 278.

[227] Avanti Sales Int'l, Inc. v. Pycosa Chem., Inc., No. 01-04-00983-CV, 2005 WL 2670740, at *3 (Tex. App.—Houston [1st Dist.] Oct. 20, 2005, no pet.).

[228] 63 CR 65177 (App. A) (emphasis added).

[229] 63 CR 35183 (App. A) (emphasis added).

Harris County requested that the jury also be asked if International

Paper:

> [C]aused, suffered, allowed, or permitted the handling
> or disposal of Industrial Solid Waste in such a manner
> so as to cause … [t]he creation and maintenance of a
> nuisance, or … [t]he endangerment of the public health
> and welfare at any time from December 31, 1975, until
> March 30, 2008?[230]

The following table shows the differences between the liability

questions that the trial court submitted and the requested issues on

endangerment and nuisance that the trial court refused:

| Sub-Issue | Submitted Question | | Requested Issue | |
|---|---|---|---|---|
| | #1 | #4 | Endangerment of Public Health | Nuisance |
| Must sludge be dangerous or a nuisance? | No—sludge need not be dangerous or a nuisance | | Dangerous | Nuisance |
| Is discharge, or imminent threat of discharge, required? | Discharge | Discharge or imminent threat | No discharge or imminent threat of discharge required | |

This shows that the requested endangerment and nuisance issues are

not functionally equivalent to the issues the jury answered.

Under the Texas Administrative Code, these issues are separate

and distinct violations.   The Texas Administrative Code prohibits

---

[230] 63 CR 35097 (App. E) (emphasis added).

51

causing, suffering, allowing, or permitting the handling or disposal of

industrial solid waste in such a manner so as to cause:

- The discharge or imminent threat of discharge of industrial solid waste into or adjacent to the waters in the state without a permit;

- The creation and maintenance of a nuisance; or

- The endangerment of the public health and welfare.[231]

Therefore, under TCEQ rules the discharge of industrial solid waste

without a permit is separate from disposing of industrial solid waste in

a manner that endangers the public health and welfare or creates a

nuisance.

In submitted Questions One and Four, the issues were whether

the sludge left the Pits and entered the San Jacinto River, or whether

there was an imminent threat that would happen.[232]  The focus was on

the movement of the sludge—the "discharge"—into the River.  There

was no requirement that the sludge had to be dangerous.  It only had to

move, or be in danger of moving, into or adjacent to the River.

The endangerment-of-public-health issue that the trial court

refused to submit to the jury focused on the danger posed by the

---

[231] 30 TEX. ADMIN. CODE § 335.4.

[232] 63 CR 35177, 35183 (App. A); 30 TEX. ADMIN. CODE § 335.4(1).

52

sludge—not whether it was moving into the River.[233] The jury had to consider whether International Paper's disposal of the sludge endangered the public health, which could be met regardless whether the sludge was ever discharged into, or near, the River or if it stayed in the Pits where it was dumped.[234] The jury could have found International Paper liable under the requested issue if the sludge as dumped was dangerous, even if the jury did not find that the sludge moved, or was in danger of moving, into the water.

For example, Harris County provided evidence that there is a danger that hurricanes and floods could dislodge the sludge from the Pits and cause it to enter the River, thus endangering the public health.[235] The submitted Question Four asked whether International Paper's disposal had caused an actual discharge or the "imminent threat of discharge."[236] The jury could have believed Harris County's evidence that hurricanes and floods could move the sludge into the River, but because hurricanes and floods are not common occurrences, it

[233] 63 CR 35097 (App. E).

[234] Id.

[235] 66 RR 32-33.

[236] 63 CR 35183 (App. A). Submitted Question One required a discharge, so an imminent threat of discharge would not result in liability under Question One. 63 CR 35177 (App. A).

could have found that the threat was not "imminent," thereby resulting in a "No" answer to submitted Question Four.[237]  The requested public-endangerment issue does not require that the danger be imminent, so a real—but not imminent—threat like a hurricane or flood would result in a "Yes" answer to the requested issue, but a "No" answer to the submitted questions.

A nuisance is "a condition that amounts to an unreasonable interference with a right common to the general public."[238]  The nuisance issue could be met by, for example, the fact that the dioxin contamination of the Pits curtails the ability to mine sand from the riverbed in the area around the Site.[239]  The evidence is undisputed that the Pits are contaminated with dioxin from International Paper's sludge.[240]  The evidence is also undisputed that portions of the dioxin-contaminated Pits are now under the San Jacinto River.[241]  And International Paper's own witnesses testified that dredging will release

---

[237] 66 RR 32-33.

[238] In re Premcor Ref., 233 S.W.3d at 907; Jamail, 970 S.W.2d at 676; RESTATEMENT (SECOND) OF TORTS § 821B(1).

[239] 70 RR 73, 175-176.

[240] 68 RR 14; 70 RR 178; 71 RR 26.

[241] PX 1005; 63 RR 107-108; 65 RR 163.

the dioxin into the River and that the dioxin contamination caused the cancellation of dredging permits.[242]   The jury, therefore, could have found that International Paper created a nuisance even if the jury did not find that the sludge had moved, or was in danger or moving, into the water as it sits.

The jury, therefore, could have found that International Paper's disposal of the sludge in the Pits endangered the public health or created a nuisance even though it found that International Paper's disposal of the sludge did not cause the discharge, or imminent threat of discharge, of the sludge into or adjacent to the water.   That means Harris County's requested issues on public endangerment and nuisance were not the "functional equivalent" of the submitted issues.   So the exception does not apply, which means that the refusal to submit the requested issues was harmful error.

---

[242] 70 RR 173, 177-178.

55

**II.** **The trial court erred in the jury instructions that it gave regarding International Paper causing, suffering, allowing, or permitting a discharge or imminent threat of discharge of waste.**

The trial court did not err just by refusing to submit the public-endangerment and nuisance issues. The trial court also erred in the instructions that it gave. Specifically, the trial court erred when it instructed the jury that International Paper no longer owned the sludge as of 1966.[243] This instruction was harmful error, so this Court should reverse the judgment and remand for retrial.

**A.** **The trial court erred when it instructed the jury that International Paper no longer owned the sludge as of 1966.**

International Paper does not dispute that it owned the sludge that was generated at its paper mill.[244] And International Paper does not dispute that it arranged for the sludge that it generated at its paper mill to be dumped in the Pits at the Site.[245] International Paper does not even dispute that the only waste ever dumped in the Pits was the sludge from its paper mill.[246]

---

[243] 63 CR 35177 (App. A); 63 CR 35183 (App. A).

[244] 65 RR 34-37; 68 RR 14.

[245] 65 RR 34-37; 68 RR 14.

[246] 68 RR 14, 51; 68 RR 51; 70 RR 120.

Instead, International Paper claims that the title to its sludge transferred from International Paper to some other entity, so it no longer owned the sludge that was dumped at the Site.[247]

International Paper does not identify any bill of sale or other agreement transferring the ownership of its sludge to another entity, and there is no such document in the record.[248]  Because there is no contractual agreement transferring the ownership of the sludge from International Paper to another entity, the only way the ownership could be transferred is by operation of law.

International Paper claims that the ownership transferred by operation of law in two separate ways:

- First, International Paper claims that, under the law regarding the disposal of garbage, ownership of the sludge passed to MIMC when MIMC picked it up for disposal at the Pits.  MIMC did not agree with International Paper on this issue.[249]

- Second, International Paper claims that the sludge became a fixture of the land after it was dumped in the Pits, thereby converting from International Paper's personal property into real property owned by Virgil McGinnes, the Site's owner, even though McGinnes was not a party to the International

---

[247] See, e.g., 64 CR 35607-35614.

[248] See, e.g., id.

[249] 56 CR 31696; 64 CR 35607-35609; see § II(A)(1) below.

Paper/MIMC agreement and there is no evidence McGinnes intended to become the owner of International Paper's sludge.[250]

Because neither of International Paper's theories are supported by the law or the facts, it did not conclusively establish that its ownership of the sludge transferred to another entity or person by operation of law. The trial court, therefore, erred when it instructed the jury "that as of 1966, [International Paper] no longer owned the waste."[251]

Whether International Paper continued to own the sludge after it was dumped in the Pits was a contested, critical issue on which the trial court changed its mind.[252] The trial court's instruction that International Paper no longer owned the waste as of 1966 was, therefore, reversible error.[253]

### 1. International Paper did not conclusively establish that the ownership of its sludge passed to MIMC when MIMC took the sludge to the Pits.

International Paper claims that a waste generator ceases to own its waste once it is disposed.[254] So—according to International Paper—

---

[250] 62 CR 34702; 64 CR 35609-35613; see § II(A)(2) below.

[251] 63 CR 35177 (App. A); 63 CR 35183 (App. A); see § II(A)(1)-(2) below.

[252] See § II(A)(3) below.

[253] Thota, 366 S.W.3d at 687; see § II(A)(3) below.

[254] 64 CR 35607-35609.

ownership of the sludge transferred from International Paper when MIMC removed the sludge from the paper mill.[255]

International Paper's argument is based on a misunderstanding of Texas law regarding disposal of waste. Under Texas law—absent an agreement transferring ownership—the ownership of waste is not transferred unless the waste owner has abandoned the waste.[256] Because there was no agreement transferring ownership of the sludge, International Paper had to conclusively establish that it abandoned the sludge.[257]

International Paper did not meet its burden to conclusively establish that it abandoned the sludge, so it did not conclusively establish that its ownership of the sludge was transferred to another entity or person.

---

[255] Id.

[256] Sharpe v. Turley, 191 S.W.3d 362, 367-68 (Tex. App.—Dallas 2006, pet. denied); R.R. Comm'n of Tex. v. Waste Mgmt. of Tex., 880 S.W.2d 835, 843 (Tex. App.—Austin 1994, no writ); see also Meyer Waste Sys., Inc. v. Indiana Dept. of State Revenue, 741 N.E.2d 1, 5 (Ind. T.C. 2000) ("With respect to ownership, this Court has held that '[a]t the point the garbage is abandoned, the generators of the garbage lose their ownership rights.'") (quoting Indiana Waste Sys. of Indiana, Inc. v. Indiana Dept. of State Revenue, 633 N.E.2d 359, 367 (Ind. T.C. 1994)).

[257] See City of Keller v. Wilson, 168 S.W.3d 802, 815-17 (Tex. 2005) (standards for conclusive evidence).

Under Texas law, International Paper did not abandon the sludge by contracting for MIMC to pick it up and dispose of it at the Site. Texas courts have held that property—including waste or garbage—is abandoned when the owner leaves "the property free to be appropriated by any other person."[258] Under Texas law, "abandon" means to "give up absolutely; to forsake entirely; to renounce utterly; to relinquish all connection with or concern it; to desert."[259] Whether property has been abandoned is "generally a fact question," and "the facts must affirmatively show an intent to abandon."[260]

International Paper's contract with MIMC shows that International Paper retained control over the sludge and did not abandon it:

- The contract specified that the sludge would be disposed at "a tract of land acceptable to [International Paper]"[261]

- The contract specified that the sludge would be transported by barge.[262]

---

[258] Waste Mgmt., 880 S.W.2d at 843; see also Sharpe, 191 S.W.3d at 368.

[259] Waste Mgmt., 880 S.W.2d at 843 (quoting BLACK'S LAW DICTIONARY 2 (6th ed. 1990)); Russell v. Am. Real Estate Corp., 89 S.W.3d 204, 209 n.5 (Tex. App.—Corpus Christi 2002, no pet.).

[260] Russell, 89 S.W.3d at 209 n.5.

[261] DX 1436 at 1.

- The contract required MIMC to have all required permits and licenses and to comply with all laws, rules, and regulations.[263]

- International Paper required MIMC to perform the work "in a good and workmanlike manner."[264]

- International Paper had the right to audit MIMC's records.[265]

- International Paper even withheld 15% of the contract payment to make sure that MIMC paid for all of its labor, material, and equipment costs.[266]

International Paper did not just have MIMC pick up the sludge in its barges and dump the sludge in the Pits. Instead, International Paper had MIMC return part of the water from the sludge slurry to its paper mill.[267] That is further evidence that International Paper continued to exercise control over the sludge even after it was dumped in the Pits.

International Paper's involvement with the sludge continued after an incident in December 1965 where rain washed away parts of the levees surrounding the Pits, reducing the height of the levee in half at

---

[262] Id.

[263] Id. at 6; 68 RR 18.

[264] DX 1436 at 6; 68 RR 18.

[265] DX 1436 at 6.

[266] Id. at 2.

[267] 70 RR 111, 119-120.

places.[268]  International Paper investigated that incident and discussed it with MIMC.[269]  International Paper expressly stated that this material—which had already been disposed—was "[International Paper's] waste sludge material" and cautioned about "the sensitive nature of this entire operation and the need for special precaution in connection with the disposal of this waste material."[270]

International Paper is not like the homeowner who leaves garbage at the curb to be picked up, never to think about it again.  Instead, International Paper specified how the sludge would be transported and disposed and was integrally involved in the entire operation regarding its sludge, including overseeing the sludge after it was dumped in the Pits.[271]

The control International Paper continued to exercise over its sludge dumped in the Pits shows that there is at least a fact issue on whether International Paper abandoned the sludge.  International Paper did not conclusively establish that title to the sludge transferred

---

[268] PX. 16.

[269] Id.

[270] Id. at 1-2 (emphasis added).

[271] Id. at 2.

from International Paper to MIMC, or any other entity.[272]  The trial court, therefore, erred when it instructed the jury that International Paper ceased owning the sludge as of 1966.

### 2. International Paper did not conclusively establish that the sludge became a fixture to the real property after it was dumped in the Pits.

International Paper also claimed that it lost ownership of the sludge after it was dumped in the Pits because the sludge supposedly became a fixture, thus transforming from International Paper's personal property to the landowner's real property.[273]

Under certain circumstances, personal property that has been attached to real property can become what is called a "fixture."[274]  If the personal property becomes a fixture, it loses its character as personal property and becomes part of the real property.[275]  So the ownership of

---

[272] This Court should also consider MIMC's position on this issue.  International Paper contends that MIMC became the owner of the sludge when it picked the sludge up for disposal.  MIMC, however, contended that it does not own—and never has owned—the sludge.  56 CR 31696.  MIMC's argument is evidence that International Paper did not transfer ownership of the sludge when it was disposed of in the Pits, so International Paper did not conclusively establish that it transferred ownership of the sludge when the sludge was picked up for disposal.

[273] 55 CR 31268-31270; 64 CR 35609-35613.

[274] Lee v. Lee, 411 S.W.3d 95, 109 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

[275] Id.

the formerly personal property would then transfer to the owner of the real property.

That is what International Paper claims happened here.[276] It asserts that the sludge became a fixture when dumped in the Pits, thereby ceasing to be its personal property and, instead, becoming part of the real property owned by the owner of the Pits.[277] International Paper is wrong: Only personal property that is an "improvement" can become a fixture.[278] And International Paper's dioxin-containing sludge is not an improvement.

Because International Paper did not conclusively establish that the sludge was an improvement, it did not conclusively establish that the sludge became a fixture. International Paper, therefore, did not conclusively establish that the sludge was converted from its personalty to the Pit owner's realty. The ownership of the sludge was a fact issue for the jury, so the trial court erred when it instructed the jury that International Paper ceased to own the sludge as of 1966.

---

[276] 55 CR 31268-31270; 64 CR 35609-35613.

[277] 55 CR 31268-31270; 64 CR 35609-35613.

[278] See § II(A)(2)(a) below.

### a. The sludge cannot be a fixture because it was not an improvement.

Under Texas law, a fixture is a type of improvement.[279]  Therefore, if the sludge was not an improvement, it cannot be a fixture under Texas law.

This Court has held that an improvement must increase the value of the property.[280]  International Paper did not provide any evidence that the sludge increased the market value of the Site.  Instead, Harris County provided evidence showing that the sludge actually decreased the Site's market value.[281]

---

[279] 56 CR 31749 ("Therefore, although all improvements are not necessarily fixtures, any fixture … is considered an improvement.") (quoting Reames v. Hawthorne-Seving, Inc., 949 S.W.2d 758, 761 (Tex. App.—Dallas 1997, pet. denied)).

[280] Dubin v. Carrier Corp., 731 S.W.2d 651, 653 (Tex. App.—Houston [1st Dist.] 1987, writ dism'd), disapproved on other grounds, Sonnier v. Chisholm-Ryder Co., 909 S.W.2d 475, 480-82 (Tex. 1995) (an improvement "includes everything that permanently enhances the value of the premises"); Dow Chem. Co. v. Abutahoun, 395 S.W.3d 335, 345-46 (Tex. App.—Dallas 2013, no pet.) ("The customary meaning of 'improvement' is a permanent addition that increases the value of the property and makes it more useful") (internal quotation omitted); Brown & Root, Inc. v. Shelton, No. 12-01-00259-CV, 2003 WL 21771917, at *4 (Tex. App.—Tyler July 31, 2003, no pet.) (quoting Trust Co. Bank v. U.S. Gypsum Co., 950 F.2d 1144, 1152 (5th Cir. 1992)) (an "improvement" is "a permanent addition that increases the value of the property and makes it more useful").

[281] PX 143 at 4.

In its 1968 board of directors minutes, MIMC addressed the market value of the Site after the dumping was complete.[282]  MIMC's board minutes recognized that the dumping of the sludge at the Site had made the land "worthless."[283]  MIMC's board minutes state that "the property was completely filled with waste materials," and that "[d]ue to its physical condition it was also regarded that the land was worthless in that it had no present sales value"[284]  MIMC, therefore, wrote down the value of the land on its books "from $50,000 cost to the nominal sum of $1."[285]

Harris County, therefore, provided evidence showing that dumping the sludge at the Site actually decreased the Site's market value, which means that the sludge was not an improvement.[286]  Because the sludge was not an improvement, by definition it could not be a fixture.[287]  The sludge, therefore, is still International Paper's

---

[282] Id.

[283] Id.

[284] Id.

[285] Id.

[286] Dubin, 731 S.W.2d at 653.

[287] 56 CR 31749; Reames, 949 S.W.2d at 761.

personal property and has not become real property belonging to the owner of the real property where the Site is located.

### b. There was no intent to incorporate the sludge into the soil, so it is not a fixture.

The sludge was not a fixture even if this Court were to hold that it was an improvement capable of becoming a fixture. The Supreme Court has established a three-part test to determine "whether personalty has become permanently attached to the realty" such that it is a fixture:

1. The mode and sufficiency of annexation, either real or constructive;

2. The adaptation of the personalty to the use or the purpose of the realty; and

3. The intent of the owner.[288]

The evidence shows that International Paper did not conclusively establish that the sludge—assuming it could even qualify as an improvement capable of becoming a fixture—met the test to become a fixture.

The Supreme Court has held that the third factor—the intent of the owner—is "critical" and that intent is "preeminent and the other

---

[288] Sonnier v. Chisholm-Ryder Co., 909 S.W.2d 475, 479 (Tex. 1995).

two are evidence of intent."[289]  International Paper failed to provide any evidence of intent to make the sludge a fixture.

International Paper did not provide any evidence showing its intention that the sludge become part of the land.  And International Paper certainly did not provide any evidence from the owner of the land showing the owner's intention that the sludge become part of the land.  The trial court ruled that Virgil McGinnes, one of MIMC's owners—not MIMC—actually owned the land where the Site was located.[290]  There was absolutely no evidence showing that McGinnes intended the sludge to become part of his land.  The record contains no evidence regarding the terms any agreement between MIMC and McGinnes that would have allowed MIMC to incorporate the sludge into the land in a way that would transfer ownership of the sludge to McGinnes.

Texas courts have described personalty being annexed to realty as becoming "part of the soil."[291]  International Paper's intent was never for the sludge to become "part of the soil."  Instead, International

---

[289] Id.

[290] 62 CR 34702.

[291] See, e.g., Cox v. Rhodes, 233 S.W.2d 924, 928 (Tex. Civ. App.—El Paso 1950, writ ref'd n.r.e.); Moore v. Carey Bros. Oil Co., 269 S.W. 75, 76 (Tex. Comm'n App. 1925); Westchester Fire Inc. Co. v. Roan, 215 S.W.985, 987 (Tex. Civ. App.—Fort Worth 1919, writ ref'd).

68

Paper's and MIMC's intent was for the sludge to remain separate from the soil in what they thought was an impermeable layer of clay.[292] Even though it turned out that the Pits were not impermeable, the intention of International Paper and MIMC was to keep the sludge separate from the soil.[293]

In addition, the sludge was not adapted to a specific use of the land. The sludge dumped in the Pits along the San Jacinto River does not contribute to the use of the land. There was evidence showing that the area around the Site has been used as a fishing spot and for mining sand.[294] The dioxin-contaminated sludge is not adapted to using the Site for fishing, mining sand, or dredging.

International Paper, therefore, did not conclusively establish that the sludge—assuming it could even be considered an improvement— became a fixture, thus becoming part of the Site's realty.

---

[292] 64 RR 53; DX 30.

[293] 63 RR 121-122, 127-130, 134.

[294] 64 RR 192-193; 70 RR 169-174, 195-196; PX 1036-A.

### c. International Paper failed to conclusively establish that removing the sludge would materially damage the Site.

This Court has also held that personal property does not become a fixture—thereby converting to real property—unless the "personal property cannot be removed without materially damaging the property."[295]

International Paper claimed that removing the sludge from the Site would materially damage the property.[296] But removing the sludge from the Site would not materially damage the property; rather, it would improve the property and cause its value to increase.

This Court has held that the test for whether removing an item would materially damage the property is whether the removal would devalue the property.[297] International Paper did not conclusively establish that removing the sludge would devalue the Site's market value. In fact, it provided no evidence on that point. Harris County

---

[295] Melendez v. State, 902 S.W. 2d, 132, 137 (Tex. App.—Houston [1st Dist.] 1995, no writ).

[296] 64 CR 35610-35611.

[297] Houston Bldg Serv., Inc. v. Am. Gen. Fire and Cas. Co., 799 S.W.2d 308, 311 (Tex. App.—Houston [1st Dist.] 1990, writ denied) ("The removal of the frames would cause material damage to the building. We acknowledge that doors could be removed without material structural damage to the rest of the structure. The removal of doors, however, would certainly devalue the building, causing material damage to the rest of the building.").

70

provided evidence showing that International Paper's dumping of the sludge at the Site lowered the Site's market value.[298]  So removing the sludge would increase—not decrease—the Site's market value.[299]

### 3. The trial court's erroneous instruction was reversible error because it related to a contested, critical issue.

An erroneous jury instruction is harmful error—and, therefore, reversible error—if it probably caused the rendition of an improper verdict.[300]  The Supreme Court has held that "[c]harge error is generally considered harmful if it relates to a contested, critical issue."[301]

The issue of whether International Paper continued to own the sludge after it was dumped in the Pits was a contested and critical issue in the case.  International Paper's position was that it could not have caused, suffered, allowed, or permitted dioxin from the sludge to seep into the water because it had no ownership interest in the sludge after it was dumped in the Pits.[302]  So the issue of whether International

---

[298] PX 143 at 4; see § II(A)(2)(a) above.

[299] PX 143 at 4; see § II(A)(2)(a) above.

[300] Tex. R. App. P. 44.1(a)(1); Columbia Rio Grande Healthcare, LP v. Hawley, 284 S.W.3d 851, 856 (Tex. 2009).

[301] Thota, 366 S.W.3d at 687.

[302] 36 CR 24674-21680.

Paper continued to own the sludge after dumping was a critical and contested issue.

The importance of the ownership issue is shown by the fact that International Paper's counsel focused on the issue in both opening statement and closing argument.[303] In opening statement, International Paper's counsel told the jury that the evidence would show International Paper ceased owning the sludge after dumping.[304] In closing argument, International Paper's counsel told the jury that International Paper could not be liable because it ceased owning the sludge after it was dumped in the Pits.[305] International Paper's counsel specifically read the jury the trial court instruction that "as of 1966, [International Paper] no longer owned the waste."[306]

The trial court's non-ownership instruction was even more harmful given the inconsistent way that it addressed the ownership issue. The trial court denied International Paper's summary-judgment motion based on its claim that it no longer owned the sludge, ruling

---

[303] 62 RR 70-71; 77 RR 52, 60.

[304] 62 RR 70-71.

[305] 77 RR 52, 60.

[306] 77 RR 60.

that the issue of International Paper's continued ownership was a fact issue.[307] Harris County, therefore, tried the case based on that understanding. Harris County's counsel told the jury in opening statement that International Paper "continued to own the sludge after delivering it to MIMC," and International Paper maintained its position that it no longer owned the sludge.[308] The trial court undercut Harris County's credibility with the jury when it—erroneously—instructed the jury that International Paper ceased owning the sludge in 1966.[309] That makes the instruction even more harmful than it would have been had the trial court consistently held that International Paper ceased owning the sludge after it was dumped in the Pits.

The trial court erred when it instructed the jury that International Paper ceased owning the sludge in 1966.[310] The erroneous instruction is harmful error—and, therefore, reversible error—because it "relate[d] to a contested, critical issue."[311] This Court, therefore, should reverse the judgment and remand for retrial because

---

[307] 62 CR 34781; 62 CR 34784; 57 RR 123; 59 RR 8-10.

[308] 62 RR 41; 62 RR 70-71.

[309] 63 CR 35177, 35183 (App. A).

[310] See § II(A)(1)-(2) above.

[311] Thota, 366 S.W.3d at 687.

of the trial court's erroneous instruction regarding ownership of the sludge.

**B.    The trial court erred when it instructed the jury that generating waste and contracting for disposal is not sufficient to establish liability.**

The trial court also erred when it instructed the jury that a "the mere fact that [International Paper] generated the waste and contracted with an independent waste disposal company for its disposal is  not, by itself, sufficient to establish that [International Paper] is liable for any discharge."[312]  In the interest of judicial economy, Harris County adopts by reference the State's brief, which addresses this issue.[313]

## PRAYER

Harris County prays that this Court reverse the trial court's judgment and remand this case for retrial.  Harris County respectfully requests that this Court make clear that evidence regarding the dangers of dioxin is admissible in the retrial and that Havner's rule regarding the doubling of the risk does not apply because this is an

---

[312] 63 CR 35177, 35183 (App. A).

[313] TEX. R. APP. P. 9.7.

74

environmental civil-penalty case brought by the government, not a toxic-tort case.

Respectfully submitted,

/s/ Rock W.A. Owens

Rock W.A. Owens
Texas Bar No. 15382100
Vince Ryan
Harris County Attorney
Texas Bar No. 99999939
Terence L. O'Rourke
Special Asst. Harris County Attorney
Texas Bar No. 15311000
OFFICE OF HARRIS COUNTY ATTORNEY
VINCE RYAN
1019 Congress, Room 1547
Houston, Texas 77002
Telephone: (713) 755-5908
Fax: (713) 437-4211
rock.owens@cao.hctx.net
terence.o'rourke@cao.hctx.net

Debra Tsuchiyama Baker
Texas Bar No. 15089600
Earnest W. Wotring
Texas Bar No. 22012400
John Muir
Texas Bar No. 14630477
David George
Texas Bar No. 00793212
BAKER•WOTRING LLP
700 JPMorgan Chase Tower
600 Travis Street
Houston, Texas 77002
Telephone: (713) 980-1700
Fax: (713) 980-1701
dbaker@bakerwotring.com
ewotring@bakerwotring.com
jmuir@bakerwotring.com
dgeorge@bakerwotring.com

Counsel for Appellant Harris County, Texas

November 13, 2015

## CERTIFICATE OF SERVICE

I certify that on November 13, 2015, I served a copy of the foregoing document upon the following counsel of record via electronic filing or certified mail:

Allyson N. Ho
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, Texas 77002

Counsel for Defendant
International Paper Co.

Mary E. Smith
Assistant Attorney General
OFFICE OF THE ATTORNEY
 GENERAL OF TEXAS
ENVIRONMENTAL PROTECTION
DIVISION
P.O. Box 12548, Capitol Station
Austin, Texas 78711

Counsel for Necessary and
Indispensable Party
The State of Texas,
acting by and through
Texas Commission on
Environmental Quality

/s/ David George
David George

## CERTIFICATE OF COMPLIANCE

This brief contains 14,726 words, excluding the caption, signature blocks, and certificates. This motion was prepared using Microsoft Word 2016 in 14 point (12 point in footnotes) Century Schoolbook (Arial headings and table of contents) font.

/s/ David George
David George

# APPENDIX



CONFIRMED FILE DATE: 11/13/2014

P-28

No. 2011-76724

| | | |
|---|---|---|
| Harris County, Texas, *et al*, *Plaintiff,* | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | |
| v | § | HARRIS COUNTY, TEXAS |
| | § | |
| International Paper Company, *et al*, | § | |
| *Defendants* | § | 295th JUDICIAL DISTRICT |

## CHARGE OF THE COURT

Members of the Jury

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room

Remember my previous instructions. Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason. I will give you a number where others may contact you in case of an emergency

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes

You must leave your notes with the bailiff when you are not deliberating. The bailiff will give your notes to me promptly after collecting them from you. I will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberations, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote

Here are the instructions for answering the questions

1 Do not let bias, prejudice, or sympathy play any part in your decision

**FILED**
Chris Daniel
District Clerk

NOV 13 2014
Time: 4:33 pm
Harris County, Texas
By_____
Deputy

35172

2   Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions   Do not consider or discuss any evidence that was not admitted in the courtroom

3   You are to make up your own minds about the facts   You are the sole judges of the credibility of the witnesses and the weight to give their testimony   But on matters of law, you must follow all of my instructions

4   If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition

5.   All the questions and answers are important   No one should say that any question or answer is not important

6   Answer "yes" or "no" to all questions unless you are told otherwise   A "yes" answer must be based on a preponderance of the evidence unless you are told otherwise   Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence unless you are told otherwise   The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case   If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no"   A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence   For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true

7   Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision   Answer each question carefully without considering who will win   Do not discuss or consider the effect your answers will have

8   Do not answer questions by drawing straws or by any method of chance

9   Some questions might ask you for a dollar amount   Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average

10   Do not trade your answers   For example, do not say, "I will answer this question your way if you answer another question my way "

11   Unless otherwise instructed, the answers to the questions must be based on the decision of at least 10 of the 12 jurors   The same 10 jurors must agree on every answer. Do not agree to be bound by a vote of anything less than 10 jurors, even if it would be a majority

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again This would waste your time and the parties' money, and would require the taxpayers of

2

35173

this county to pay for another trial   If a juror breaks any of these rules, tell that person to stop and report it to me immediately

A fact may be established by direct evidence or by circumstantial evidence or both A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken  A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved

35174

## General Definitions and Instructions

1       The "Site" means the waste site at the northwest intersection of Interstate 10 and the San Jacinto River in Harris County, Texas. A photograph of the Site in 1966 is shown on the attached Exhibit "A" hereto

2       "Harris County" means Plaintiff Harris County, Texas

3       "International Paper" means Defendant International Paper Co

4       "Champion Paper" means Champion International Corp; U S Plywood—Champion Papers, Inc, Champion Papers, Inc, The Champion Paper and Fibre Company, and The Champion Coated Paper Company, the predecessors by merger to Defendant International Paper Co

5       The "Defendants" means Defendants International Paper and its predecessor by merger Champion Paper

6       "MIMC" means McGinnes Industrial Maintenance Corporation.

7       "Industrial Waste" means waterborne liquid, gaseous, or solid substances that result from any process of industry, manufacturing, trade, or business

8       "Water in the State" means groundwater, percolating or otherwise, lakes, bays, ponds, impounding reservoirs, springs, rivers, streams, creeks, estuaries, wetlands, marshes, inlets, canals, the Gulf of Mexico, inside the territorial limits of the state, and all other bodies of surface water, natural or artificial, inland or coastal, fresh or salt, navigable or nonnavigable, and including the beds and banks of all watercourses and bodies of surface water, that are wholly or partially inside or bordering the state or inside the jurisdiction of the state

9       "Industrial Solid Waste" means Solid Waste resulting from or incidental to any process of industry or manufacturing, or mining or agricultural operation

10      "Solid waste" includes discarded material, including solid, liquid, or semisolid material resulting from industrial operations

11      "Dioxin" means 2, 3, 7, 8-Tetrachlorodibenzo-p-dioxin

12      "Hazardous Substance" means any substance designated as such by the administrator of the United States Environmental Protection Agency. Effective July 3, 1985, the United States Environmental Protection Agency designated Dioxin as a Hazardous Substance

13      Champion Paper merged into International Paper on December 31, 2000

4

35175

14      Any recovery will be determined by the court when it applies the law to your answers at the time of judgment

15      The parties have always agreed that neither Champion Paper nor International Paper has ever owned the property on which the Site is located

5

## Question One

Do you find that any of the following Defendants caused, suffered, allowed, or permitted the discharge of industrial waste containing dioxin into or adjacent to any water in the state at any time from February 15, 1973, until March 30, 2008?

> In this question, "discharge" includes to deposit, conduct, drain, emit, throw, run, allow to seep, or otherwise release or dispose of, or to allow, permit, or suffer any of these acts or omissions

> "Cause, suffer, allow, or permit" shall be defined using the common, normal, and everyday meanings for each word in the phrase  A person "causes, suffers, allows, or permits" an event when that person had the power to prevent an event at the time of the event, but failed to do so

> You are instructed that the mere fact that Champion Paper generated the waste and contracted with an independent waste disposal company for its disposal is not, by itself, sufficient to establish that Champion Paper is liable for any discharge  You are further instructed that as of 1966, Champion Paper no longer owned the waste and no longer had a contract for disposal at the Site  Champion Paper continued to have a business relationship with MIMC up to 1973

Answer "Yes" or "No" for each Defendant

a   Champion Paper (before December 31, 2000)   _____No_____

b   International Paper (on or after December 31, 2000)   _____No_____

6

35177

If you answered "Yes" to Question One for one or more of the Defendants, then answer the following question as to those Defendant(s) Otherwise, do not answer the following question

## Question Two

For each Defendant for whom you answered "Yes" in Question One, identify each violation date or range of dates on which consecutive daily violations, if any, by such Defendant occurred

Answer with the dates, or date ranges, using the month, day, and year

a       Champion Paper

You are instructed that you should write down each date of a violation (or date range of consecutive daily violations) by Champion Paper, for any violation(s) during the following time periods

(1) Dates from February 15, 1973 until August 31, 1985

_____

_____

_____

_____

_____

_____

(2) Dates from September 1, 1985 until August 31, 1997

_____

_____

_____

_____

_____

_____

7

35178

(3) Dates from September 1, 1997 until December 30, 2000

_____

_____

_____

_____

_____

_____

b  International Paper

You are instructed that you should write down each date of a violation (or date range of consecutive daily violations) by International Paper, for any violation(s) during the following time period

(1) Dates from December 31, 2000 until March 30, 2008

_____

_____

_____

_____

_____

_____

35179

If you answered "Yes" to Question One for one or more of the Defendants, then answer the following question as to those Defendant(s) Otherwise, do not answer the following question

**Question Three**

What amount of money should be assessed against each Defendant as a penalty for each day you found a violation in response to Question Two?

Your answer should fall in the following ranges, depending on the date of the violation(s)

| Date Range | Penalty Range |
|---|---|
| February 15, 1973 - August 31, 1985 | Minimum per day $50 <br> Maximum per day $1,000 |
| September 1, 1985 - August 31, 1997 | Minimum per day $50 <br> Maximum per day $10,000 |
| September 1, 1997 - March 30, 2008 | Minimum per day $50 <br> Maximum per day $25,000 |

For each of the dates, if any, you found that a Defendant committed a violation in response to Question Two, do the following two things (i) re-enter those date(s) or date range(s) in the applicable table below, and (ii) enter the proper penalty per day for each of those violations You may impose different penalties for individual day(s) or for day(s) within a date range

a    Champion Paper

(1) Dates from February 15, 1973 until August 31, 1985
   *(Penalty Amounts must be within the range of $50 - $1,000 per day of violation)*

| Date or Date Range | Penalty Amount Per Day |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

(2) Dates from September 1, 1985 until August 31, 1997

9

35180

*(Penalty Amounts must be within the range of $50 - $10,000 per day of violation)*

| Date or Date Range | Penalty Amount Per Day |
| --- | --- |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

(3) Dates from September 1, 1997 until December 30, 2000
*(Penalty Amounts must be within the range of $50 - $25,000 per day of violation)*

| Date or Date Range | Penalty Amount Per Day |
| --- | --- |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

b     International Paper

(1) Dates from December 31, 2000 until March 30, 2008
*(Penalty Amounts must be within the range of $50 - $25,000 per day of violation)*

| Date or Date Range | Penalty Amount Per Day |
| --- | --- |
| _____ | _____ |
| _____ | _____ |

10

35181

35182

## Question Four

Do you find that any of the following Defendants caused, suffered, allowed, or permitted the handling or disposal of industrial solid waste containing dioxin in such a manner so as to cause the discharge or imminent threat of discharge of industrial solid waste containing dioxin into or adjacent to the water in the State at any time from December 31, 1975, until March 30, 2008?

"Disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste (whether containerized or uncontainerized) into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be discharged into any waters

In this question, "discharge" means accidental or intentional spilling, leaking, pumping, pouring, emitting, emptying, or dumping of waste into or on any land or water

"Cause, suffer, allow, or permit" shall be defined using the common, normal, and everyday meanings for each word in the phrase  A person "causes, suffers, allows, or permits" an event when that person had the power to prevent an event at the time of the event, but failed to do so

You are instructed that the mere fact that Champion Paper generated the waste and contracted with an independent waste disposal company for its disposal is not, by itself, sufficient to establish that Champion Paper is liable for any discharge  You are further instructed that as of 1966, Champion Paper no longer owned the waste and no longer had a contract for disposal at the Site  Champion Paper continued to have a business relationship with MIMC up to 1973

Answer "Yes" or "No" for each Defendant

a      Champion Paper (before December 31, 2000).          _**No**_

b      International Paper (on or after December 31, 2000)    _**No**_

35183

If you answered "Yes" to Question Four for one or more of the Defendants, then answer the following question as to those Defendant(s)  Otherwise, do not answer the following question

## Question Five

For each Defendant for whom you answered "Yes" in Question Four, identify each violation date or range of dates on which consecutive daily violations, if any, by such Defendant occurred

Answer with the dates, or date ranges, using the month, day, and year·

a       Champion Paper

You are instructed that you should write down each date of a violation (or date range of consecutive daily violations) by Champion Paper, for any violation(s) during the following time periods

(1) Dates from December 31, 1975 until August 31, 1981

_____

_____

_____

_____

_____

_____

(2) Dates from September 1, 1981 until August 31, 1985

_____

_____

_____

_____

_____

_____

13

35184

(3) Dates from September 1, 1985 until August 31, 1997·

_____

_____

_____

_____

_____

_____

(4) Dates from September 1, 1997 until December 30, 2000

_____

_____

_____

_____

_____

b    International Paper

You are instructed that you should write down each date of a violation (or date range of consecutive daily violations) by International Paper, for any violation(s) during the following time period

(1) Dates from December 31, 2000 until March 30, 2008

_____

_____

_____

_____

14

If you answered "Yes" to Question Four for one or more of the Defendants, then answer the following question as to those Defendant(s) Otherwise, do not answer the following question

## Question Six

What amount of money should be assessed against each Defendant as a penalty for each day you found a violation in response to Question Five?

Your answer should fall in the following ranges, depending on the date of the violation(s)

| Date Range | Penalty Range |
|---|---|
| December 31, 1975 - August 31, 1981 | Minimum per day  $50<br>Maximum per day  $1,000 |
| September 1, 1981 - August 31, 1985 | Minimum per day  $50<br>Maximum per day  $2,000 |
| September 1, 1985 - August 31, 1997 | Minimum per day  $100<br>Maximum per day  $25,000 |
| September 1, 1997 - March 30, 2008 | Minimum per day  $50<br>Maximum per day  $25,000 |

For each of the dates, if any, you found that a Defendant committed a violation in response to Question Five, do the following two things   (i) re-enter those date(s) or date range(s) in the applicable table below, and (ii) enter the proper penalty per day for each of those violations   You may impose different penalties for individual day(s) or for day(s) within a date range

a        Champion Paper

(1) Dates from December 31, 1975 until August 31, 1981
*(Penalty Amounts must be within the range of $50 - $1,000 per day of violation)*

| Date or Date Range | Penalty Amount Per Day |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

15

35186

(2) Dates from September 1, 1981 until August 31, 1985
   *(Penalty Amounts must be within the range of $50 - $2,000 per day of violation)*

| Date or Date Range | Penalty Amount Per Day |
| --- | --- |
| | |
| | |
| | |
| | |

(3) Dates from September 1, 1985 until August 31, 1997
   *(Penalty Amounts must be within the range of $100 - $25,000 per day of violation)*

| Date or Date Range | Penalty Amount Per Day |
| --- | --- |
| | |
| | |
| | |
| | |

(4) Dates from September 1, 1997 until December 30, 2000
   *(Penalty Amounts must be within the range of $50 - $25,000 per day of violation)*

| Date or Date Range | Penalty Amount Per Day |
| --- | --- |
| | |

16

35187

_____     _____

_____     _____

_____     _____

_____     _____

b     International Paper

(1) Dates from December 31, 2000 until March 30, 2008
*(Penalty Amounts must be within the range of $50 - $25,000 per day of violation)*

| Date or Date Range | Penalty Amount Per Day |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

17

35188

If you answered "Yes" to Questions One and/or Four for one or more of the Defendants, then answer the following question  Otherwise, do not answer the following question

## Question Seven

What is the reasonable fee for the services of the Connelly Baker Wotring LLP Law Firm representing Harris County in bringing this civil-penalty case, stated in dollars and cents?

Factors to consider in determining a reasonable fee include—

1. The time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly

2. The likelihood that the acceptance of the particular employment will preclude other employment by the lawyer

3. The fee customarily charged in the locality for similar legal services

4. The amount involved and the results obtained

5. The time limitations imposed by the client or by the circumstances

6. The nature and length of the professional relationship with the client

7. The experience, reputation, and ability of the lawyer or lawyers performing the services

8. Whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered

Answer with an amount in dollars and cents for each of the following

a       For representation in the trial court

Answer _____

b       For representation through appeal to the court of appeals

Answer _____

c       For representation at the petition for review stage in the Supreme Court of Texas

18

35189

Answer _____

d     For representation at the merits briefing stage in the Supreme Court of Texas

      Answer _____

e     For representation through oral argument and the completion of proceedings in the
      Supreme Court of Texas

      Answer _____

35190

If you answered "Yes" to Questions One and/or Four for one or more of the Defendants, then answer the following question as to those Defendant(s) Otherwise, do not answer the following question

## Question Eight

Were any of the violations you found in Questions One and/or Four caused solely by an act of God?

An occurrence is caused by an act of God if it is caused directly and exclusively by the violence of nature, without human intervention or cause, and could not have been prevented by reasonable foresight or care An occurrence is not caused solely by an act of God if it could be avoided by the exercise of due care, foresight, or proper planning, maintenance, or operation

Answer "Yes" or "No" for each Defendant

a    Champion Paper (before December 31, 2000)          _____

b    International Paper (on or after December 31, 2000)          _____

20

35191

If you answered "Yes" to Question Eight for one or more of the Defendants, then answer the following question as to those Defendant(s)  Otherwise, do not answer the following question

**Question Nine**

Identify by date, or range of dates, when the violations that you found in Questions One and/or Four were caused solely by an act of God?

Answer with a dates, or range of dates, using the month, day, and year for each Defendant you answered "Yes" to in response to Question Eight

a      Champion Paper (before December 31, 2000)

_____

_____

_____

_____

b      International Paper (on or after December 31, 2000)

_____

_____

_____

_____

21

35192

If you answered "Yes" to Question Four for one or more of the Defendants, then answer the following question as to those Defendant(s) Otherwise, do not answer the following question

**Question Ten**

On any day after September 1, 1997, were any of the Defendants listed below also a person responsible for solid waste? Answer only for the Defendants that you determined committed violations in Question Four

How you decide this question should not influence your consideration about how you answer Questions One through Six.

A person is responsible for solid waste if the person

> (1) is any owner or operator of a solid waste facility,
>
> (2) owned or operated a solid waste facility at the time of processing, storage, or disposal of any solid waste,
>
> (3) by contract, agreement, or otherwise, arranged to process, store, or dispose of, or arranged with a transporter for transport to process, store, or dispose of, solid waste owned or possessed by the person, by any other person or entity at
>
>> (A) the solid waste facility owned or operated by another person or entity that contains the solid waste, or
>> (B) the site to which the solid waste was transported that contains
>> the solid waste, or
>
> (4) accepts or accepted any solid waste for transport to a solid waste facility or site selected by the person

Answer "Yes" or "No" for each Defendant listed below, if you answered "Yes" to Question Four for that Defendant

a     Champion Paper (before December 31, 2000)     _____

b     International Paper (on or after December 31, 2000)     _____

22

35193

If you answered "Yes" to Question Ten for one or more of the Defendants, then answer the following question as to those Defendant(s) Otherwise, do not answer the following question

## Question Eleven

Were any of the violations you found in Question Four caused solely by acts or omissions of a third person?

A violation is caused solely by an act or omission of a third person if the Defendant

(1)     exercised due care concerning the solid waste, considering the characteristics of the solid waste, in light of all relevant facts and circumstances, and

(2)     took precautions against foreseeable acts or omissions of the third person and the consequences that could foreseeably result from those acts or omissions

A "third person" does not include

(1)     employees or agents of the Defendant for which you are answering this question, or,

(2)     those who have a direct or indirect contractual relationship with the Defendant for which you are answering this question

Answer "Yes" or "No" for each Defendant listed below

a     Champion Paper (before December 31, 2000)          _____

b     International Paper (on or after December 31, 2000)     _____

23

35194

If you answered "Yes" to Question Eleven for one or more of the Defendants, then answer the following question as to those Defendant(s) Otherwise, do not answer the following question

**Question Twelve**

On which dates were the violations that formed the basis for your answer to Question Four caused solely by acts or omissions of a third person?

For each of the following Defendants, write the date(s) or range(s) of consecutive dates on which the alleged violation(s) were caused solely by acts or omissions of a third person

a    Champion Paper

(1) Dates from September 1, 1997 until December 30, 2000

_____

_____

_____

_____

_____

b    International Paper

(1) Dates from December 31, 2000 until March 30, 2008

_____

_____

_____

_____

_____

24

35195

**Presiding Juror:**

1 When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror

2 The presiding juror has these duties
   a have the complete charge read aloud if it will be helpful to your deliberations,
   b preside over your deliberations, meaning manage the discussions, and see that you follow these instructions,
   c give written questions or comments to the bailiff who will give them to the judge,
   d write down the answers you agree on,
   e get the signatures for the verdict certificate, and
   f notify the bailiff that you have reached a verdict

Do you understand the duties of the presiding juror? If you do not, please tell me now

**Instructions for Signing the Verdict Certificate:**

1 Unless otherwise instructed, you may answer the questions on a vote of 10 jurors   The same 10 jurors must agree on every answer in the charge   This means you may not have one group of 10 jurors agree on one answer and a different group of 10 jurors agree on another answer

2 If 10 jurors agree on every answer, those 10 jurors sign the verdict

If 11 jurors agree on every answer, those 11 jurors sign the verdict

If all 12 of you agree on every answer, you are unanimous and only the presiding juror signs the verdict

3 All jurors should deliberate on every question   You may end up with all 12 of you agreeing on some answers, while only 10 or 11 of you agree on other answers   But when you sign the verdict, only those 10 who agree on every answer will sign the verdict

Do you understand these instructions? If you do not, please tell me now

_Caroline Baker_
Judge Presiding

25

35196

## Verdict Certificate

Check one

_____ Our verdict is unanimous   All 12 of us have agreed to each and every answer   The presiding juror has signed the certificate for all 12 of us

_____        _____
Signature of Presiding Juror        Printed Name of Presiding Juror

_____ Our verdict is not unanimous   Eleven of us have agreed to each and every answer and have signed the certificate below

✓ Our verdict is not unanimous   Ten of us have agreed to each and every answer and have signed the certificate below

SIGNATURE | NAME PRINTED
--- | ---
1 *Nathan Lim Boddo* | Nathaniel Lowis Boddo
2 *Ron Porteous* | RoN PorTeous
3 *Aaron Bradley* | Aaron Bradley
4 *George Villarreal* | GEORGE VILLARREAL
5 *Brenda White* | Brenda White
6 Mary Helen Schmidt | Mary Helen Schmidt
7 Jessica Saldana | Jessica Saldana
8 | LISA JEAN COLE
9 *Heidi Sperandeo* | Heidi Sperandeo
10 *Crisaundra J Butler* | Crisaundra J. Butler
11 |

26

35197

# Exhibit A

35198



0      1,000

feet

Figure 6a

35199

B

CAUSE NO 2011-76724

| | | |
|---|---|---|
| HARRIS COUNTY, TEXAS, *Plaintiff*, | § | IN THE DISTRICT COURT OF |
| | § | |
| and | § | |
| | § | |
| THE STATE OF TEXAS, acting by and through | § | |
| the TEXAS COMMISSION ON | § | |
| ENVIRONMENTAL QUALITY, *A Necessary and* | § | HARRIS COUNTY, TEXAS |
| *Indispensable Party*, | § | |
| | § | |
| | § | |
| v. | § | |
| | § | |
| INTERNATIONAL PAPER COMPANY, | § | |
| MCGINNES INDUSTRIAL MAINTENANCE | § | 295TH JUDICIAL DISTRICT |
| CORPORATION, WASTE MANAGEMENT, | | |
| INC., AND WASTE MANAGEMENT OF | | |
| TEXAS, INC., Defendants. | | |

## FINAL JUDGMENT

On October 16, 2014, the above cause of action was called for trial before a jury of twelve persons who were duly accepted, impaneled, and sworn. Plaintiff Harris County, Texas appeared by and through its attorneys and announced ready for trial. The State of Texas, acting by and through the Texas Commission on Environmental Quality, a necessary and indispensable party, appeared by and through its attorneys and announced ready for trial. Defendant International Paper Company appeared by and through its attorneys and announced ready for trial. Former Defendants McGinnes Industrial Maintenance Corporation and Waste Management of Texas, Inc. appeared by and through their respective attorneys and announced ready for trial. Before trial began, however, the Court dismissed Plaintiff Harris County, Texas's claims against former Defendant Waste Management, Inc. on the latter party's motion.

After all parties rested, on November 13, 2014, Plaintiff Harris County, Texas, the State of Texas, acting by and through the Texas Commission on Environmental Quality, and former Defendants McGinnes Industrial Maintenance Corporation, Waste Management of Texas, Inc., and Waste Management, Inc. announced a settlement of the claims by and against these parties, but not Defendant International Paper Company. On the joint motion of said parties, but not

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

35217

Defendant International Paper Company, the Court severed the claims by and against those settling parties and assigned a new cause number ("2011-76724A") for those claims. Accordingly, no issues on any claims by or against former Defendants McGinnes Industrial Maintenance Corporation, Waste Management of Texas, Inc., and Waste Management, Inc. were submitted to the jury.

On November 13, 2014, after presentation of the testimony, evidence, arguments of counsel, and instructions of the court, the special issues were submitted to the jury as set forth in the Charge of the Court. In response, the jury returned its verdict on that same date of November 13, 2014, which the Court received, filed, and entered of record. The questions submitted to the jury and the jury's findings are attached as Exhibit "1" and incorporated by reference in their entirety and are summarized as follows:

QUESTION ONE: Do you find that any of the following Defendants caused, suffered, allowed, or permitted the discharge of industrial waste containing dioxin into or adjacent to any water in the state at any time from February 15, 1973, until March 30, 2008?

ANSWER FOR CHAMPION PAPER: No.

ANSWER FOR INTERNATIONAL PAPER: No.

QUESTION TWO: For each Defendant for whom you answered "Yes" in Question One, identify each violation date or range of dates on which consecutive daily violations, if any, by such Defendant occurred.

IN ACCORDANCE WITH THE COURT'S INSTRUCTION, NO ANSWER WAS PROVIDED BASED ON ANSWERS TO QUESTION ONE.

QUESTION THREE: What amount of money should be assessed against each Defendant as a penalty for each day you found a violation in response to Question Two?

IN ACCORDANCE WITH THE COURT'S INSTRUCTION, NO ANSWER WAS PROVIDED BASED ON ANSWERS TO QUESTION ONE.

QUESTION FOUR: Do you find that any of the following Defendants caused, suffered, allowed, or permitted the handling or disposal of industrial solid waste containing dioxin in such a manner so as to cause the discharge or imminent threat of discharge of

35218

industrial solid waste containing dioxin into or adjacent to the water in the State at any time from December 31, 1975, until March 30, 2008?

ANSWER FOR CHAMPION PAPER: No.

ANSWER FOR INTERNATIONAL PAPER: No.

QUESTION FIVE: For each Defendant for whom you answered "Yes" in Question Four, identify each violation date or range of dates on which consecutive daily violations, if any, by such Defendant occurred.

IN ACCORDANCE WITH THE COURT'S INSTRUCTION, NO ANSWER WAS PROVIDED BASED ON ANSWERS TO QUESTION FOUR.

QUESTION SIX: What amount of money should be assessed against each Defendant as a penalty for each day you found a violation to Question Five?

IN ACCORDANCE WITH THE COURT'S INSTRUCTION, NO ANSWER WAS PROVIDED BASED ON ANSWERS TO QUESTION FOUR.

QUESTION SEVEN: What is the reasonable fee for the services of the Connelly Baker Wotring LLP Law Firm representing Harris County in bringing this civil-penalty case, stated in dollars and cents?

IN ACCORDANCE WITH THE COURT'S INSTRUCTION, NO ANSWER WAS PROVIDED BASED ON ANSWERS TO QUESTIONS ONE AND FOUR.

QUESTION EIGHT: Were any of the violations you found in Questions One and/or Four caused solely by an act of God?

IN ACCORDANCE WITH THE COURT'S INSTRUCTION, NO ANSWER WAS PROVIDED BASED ON ANSWERS TO QUESTIONS ONE AND FOUR.

QUESTION NINE: Identify by date, or range of dates, when the violations that you found in Questions One and/or Four were caused solely by an act of God.

IN ACCORDANCE WITH THE COURT'S INSTRUCTION, NO ANSWER WAS PROVIDED BASED ON ANSWERS TO QUESTIONS ONE AND FOUR AND LACK OF ANSWER TO QUESTION EIGHT.

QUESTION TEN: On any day after September 1, 1997, were any of the Defendants listed below also a person responsible for solid waste?

IN ACCORDANCE WITH THE COURT'S INSTRUCTION, NO ANSWER WAS PROVIDED BASED ON ANSWERS TO QUESTION FOUR.

35219

QUESTION ELEVEN: Were any of the violations you found in Question Four caused solely by acts or omissions of a third person?

> IN ACCORDANCE WITH THE COURT'S INSTRUCTION, NO ANSWER WAS PROVIDED BASED ON ANSWERS TO QUESTION FOUR AND LACK OF ANSWER TO QUESTION TEN.

QUESTION TWELVE: On which dates were the violations that formed the basis of your answer to Question Four caused solely by acts or omissions of a third person?

> IN ACCORDANCE WITH THE COURT'S INSTRUCTION, NO ANSWER WAS PROVIDED BASED ON ANSWERS TO QUESTION FOUR AND LACK OF ANSWER TO QUESTION ELEVEN.

After the jury was released, Defendant International Paper Company moved for judgment based on the verdict. Having considered that motion, the arguments of counsel, and all matters of record, the Court finds that with respect to the claims against Defendant International Paper Company, including its predecessors in interest, the jury's verdict is in favor of Defendant International Paper Company, including its predecessors in interest, and against Plaintiff Harris County, Texas, the State of Texas, and the Texas Commission on Environmental Quality. The Court is therefore of the opinion that, on the merits, judgment should be rendered in favor of Defendant International Paper Company and against Plaintiff Harris County, Texas, the State of Texas, and the Texas Commission on Environmental Quality in conformance with the pleadings, the nature of the case proved, and the jury's verdict. The Court hereby renders the Final Judgment as follows:

It is ORDERED, ADJUDGED, AND DECREED that Plaintiff Harris County, Texas, the State of Texas, and the Texas Commission on Environmental Quality recover nothing on all claims against Defendant International Paper Company.

It is further ORDERED, ADJUDGED, AND DECREED that Defendant International Paper Company's counterclaims for declaratory judgment are DISMISSED AS MOOT AND

35220

WITHOUT PREJUDICE, subject to Defendant International Paper Company's right to try those counterclaims in the event this cause of action is reversed or remanded by appeal.

The Court finds that Defendant International Paper Company is the successful party as that term is used in Texas Rule of Civil Procedure 131 and further ORDERS that Plaintiff Harris County, Texas shall pay to Defendant International Paper Company all taxable costs, consisting of all fees of the clerk, all service fees, and all fees of the court reporters for the original of stenographic deposition, hearing, and trial transcripts and exhibits obtained for use in the suit.

The Court ORDERS execution to issue for this Final Judgment as allowed by law in favor of Defendant International Paper Company, and further ORDERS that all writs and process for the enforcement and collection of this Final Judgment may issue as necessary.

It is further ORDERED, ADJUDGED, AND DECREED that all requested relief by Plaintiff Harris County, Texas, the State of Texas, acting by and through the Texas Commission on Environmental Quality, or Defendant International Paper Company that is not expressly granted or denied herein is hereby DENIED.

This is the Final Judgment of the Court, which disposes of all claims and all parties, and is appealable.

35221

Signed this __20__ th day of January, 2015.

JAN 2 0 2015

_Caroline Baker_
Judge Caroline E. Baker

35222



FILED
Chris Daniel
District Clerk

APR 06 2015

P-2
MNTR4

No. 2011-76724

| | | |
|---|---|---|
| HARRIS COUNTY, TEXAS, *Plaintiff* | § § § § | IN THE DISTRICT COURT OF |
| and | § § | HARRIS COUNTY, TEXAS |
| THE STATE OF TEXAS, acting by and *through the* TEXAS COMMISSION ON ENVIRONMENTAL QUALITY, *a necessary and indispensable party* | § § § § § § | 295th JUDICIAL DISTRICT |
| VS. | § § § | |
| INTERNATIONAL PAPER COMPANY, MCGINNES INDUSTRIAL MAINTENANCE CORPORATION, WASTE MANAGEMENT, INC., AND WASTE MANAGEMENT OF TEXAS, *Defendants* | § § § § § § § § | |

No. 2012-58016

| | | |
|---|---|---|
| Dao Van Pho, et al., *Plaintiffs* | § § | IN THE DISTRICT COURT OF |
| VS. | § § § | HARRIS COUNTY, TEXAS |
| International Paper Company, *et al.*, *Defendants* | § § § | 125th JUDICIAL DISTRICT |

No. 2012-66308

| | | |
|---|---|---|
| Jim Harpster and Jennifer Harpster, *et al., Plaintiffs* | § § § | IN THE DISTRICT COURT OF |
| VS. | § § § | HARRIS COUNTY, TEXAS |
| International Paper Company, *et al.*, *Defendants* | § § § § | 11th JUDICIAL DISTRICT |

## ORDER

Came on to be heard Plaintiff Harris County's Motion for New Trial   Upon

consideration, the Court DENIES Plaintiff Harris County's Motion for New Trial.

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

35637

Signed this 6th day of April, 2015

APR 0 6 2015

*Caroline Baker*
JUDGE PRESIDING



No. 2011-76724

| | | |
|---|---|---|
| Harris County, Texas, *et al., Plaintiff,* | § | IN THE DISTRICT COURT OF |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| International Paper Company, *et al.,* | § | |
| *Defendants.* | § | 295th JUDICIAL DISTRICT |

## PLAINTIFF HARRIS COUNTY'S NOTICE OF APPEAL

Plaintiff Harris County appeals from this Court's:

1. January 20, 2015 Final Judgment (attached as Exhibit A);

2. April 6, 2015 Order Denying Harris County's Motion for New Trial (attached as Exhibit B);

3. January 20, 2015 Order on International Paper Company's Motion for Directed Verdict (attached as Exhibit C);

4. January 9, 2015 Order on Defendants' Motions to Exclude the Reports, Opinions, and Testimony of Dr. Philip Bedient and Motion to Exclude the Report, Opinions, and Testimony of Dr. John Pardue and Amended Motion to Exclude the New Opinions, HEC-RAS Modeling, River Gauge Data and Related Testimony of Dr. Philip Bedient and testimony of Dr. John Pardue Regarding Dr. Rifai's 2013 Chemosphere Paper and the Amount of Dioxin that Entered the San Jacinto River (attached as Exhibit D);

5. December 3, 2014 Order on Defendants' Motion to Exclude the Report, Opinions, and Testimony of Dr. Wayne Snodgrass (attached as Exhibit E);

6. December 3, 2014 Order on International Paper Company's Traditional and No-Evidence Motion for Summary Judgment on Causation Against Harris County (attached as Exhibit F);

7. December 3, 2014 Order on International Paper Company's Traditional and No-Evidence Motion for Summary Judgment on Specific Elements of Harris County's Statutory Claims (attached as Exhibit G);

8. December 3, 2014 Order on Defendants' Motion to Exclude the Report, Opinions, and Testimony of Dr. Joan Meyer (attached as Exhibit H);

35681

9. December 3, 2014 Order on Defendants' Motion to Exclude the Report, Opinions, and Testimony of Dr. Arnold Schecter (attached as Exhibit I);

10. December 3, 2014 Order on Defendants' Motion to Exclude the Report, Opinions, and Testimony of Dr. James Olson (attached as Exhibit J); and

11. Every adverse ruling prior to this Court's Final Judgment that is subsumed therein, as well as any adverse ruling subsequent to this Court's Final Judgment that upholds this Court's Final Judgment.

Harris County appeals to the First Court of Appeals in Houston, Texas, because a prior appeal in this case was filed in that court.[1]

---

[1] *Int'l Paper Co. v. Harris County*, 445 S.W.3d 379 (Tex. App.—Houston [1st Dist.], no pet.); Tex. Govt. Code 22.202(h); TEX. APP.—HOUSTON [1ST DIST.] LOCAL R. 1.4(b).

2

35682

Respectfully submitted,

**OFFICE OF HARRIS COUNTY ATTORNEY,
VINCE RYAN**

/s/ Rock W. A. Owens

Rock W.A. Owens
Texas Bar No. 15382100
Vince Ryan
Harris County Attorney
Texas Bar No. 99999939
Terence L. O'Rourke
Special Assistant Harris County Attorney
Texas Bar No. 15311000
1019 Congress, 15th Floor
Houston, Texas 77002
Telephone: (713) 274-5121
Facsimile: (713) 437-4211

and

**CONNELLY • BAKER • WOTRING LLP**

/s/ Debra Tsuchiyama Baker

Debra Tsuchiyama Baker
State Bar No. 15089600
Earnest W. Wotring
State Bar No. 22012400
Michael Connelly
State Bar No. 04685000
John Muir
State Bar No. 14630477
David George
State Bar No. 00793212
700 JPMorgan Chase Tower
600 Travis Street
Houston, Texas 77002
Telephone: (713) 980-1700
Facsimile: (713) 980-1701
Email: dbaker@connellybaker.com
Email: ewotring@connellybaker.com
Email: mconnelly@connellybaker.com
Email: jmuir@connellybaker.com

**ATTORNEYS FOR PLAINTIFF,
HARRIS COUNTY, TEXAS**

3

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument is being served upon all counsel of record via email, facsimile, certified mail, and/or hand delivery on April 17, 2015.

| | |
|---|---|
| Winstol D. Carter, Jr.<br>Allyson N. Ho<br>Craig A. Stanfield<br>Morgan, Lewis & Bockius LLP<br>1000 Louisiana St., Suite 4000<br>Houston, Texas 77002<br>Telephone: (713) 890-5000<br>Facsimile: (713) 890-5001<br>Email: wcarter@morganlewis.com<br>Email: aho@morganlewis.com<br>Email: cstanfield@morganlewis.com | Counsel for International Paper Co. |
| Mary E. Smith<br>Anthony Benedict<br>Assistant Attorney General<br>Office of the Attorney General of Texas<br>Environmental Protection Division<br>P.O. Box 12548, Capitol Station<br>Austin, Texas 78711-2548<br>Telephone (512) 463-2012<br>Facsimile (512) 320-0911<br>Email: mary.smith@texasattorneygeneral.gov<br>Email: anthony.benedict@texasattorneygeneral.gov | Counsel for the State of Texas,<br>Texas Commission on Environmental<br>Quality |

/s/ Earnest Wotring
Earnest Wotring

4

35684

E

No 2011-76724

| Harris County, Texas, *et al*, *Plaintiff*, | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| International Paper Company, *et al*, | § | |
| *Defendants* | § | 295th JUDICIAL DISTRICT |

### Plaintiff Harris County's Requested Question Number One
### (To Replace Question Eight)

Do you find that any of the following Defendants caused, suffered, allowed, or permitted the handling or disposal of Industrial Solid Waste in such a manner so as to cause:

1. The Discharge or imminent threat of discharge of industrial solid waste into or adjacent to the water in the state;

2. The creation and maintenance of a nuisance, or

3. The endangerment of the public health and welfare

at any time from December 31, 1975, until March 30, 2008?

Offered: ___✓___

_____
Granted

___✓___

_____
Refused

_____
Modified as Follows:

Judge Caroline Baker
11/11/14

35097

No 2011-76724

| | | |
|---|---|---|
| Harris County, Texas, *et al*, *Plaintiff*, | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | |
| v | § | HARRIS COUNTY, TEXAS |
| | § | |
| International Paper Company, *et al*, | § | |
| *Defendants* | § | 295th JUDICIAL DISTRICT |

## Plaintiff Harris County's Requested Question Number Two
### (Additional Instruction for Question Eight)

A "Nuisance" is a condition that substantially interferes with the use and enjoyment of property by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities.

Offered: ✓

_____
Granted

✓
_____
Refused

_____
Modified as Follows:

Judge Caroline Baker
11/11/14

35098

F

TCEQ Q8

## Question _____
### Admin. Code Violation
### 30 Tex. Admin. Code § 335.4

Do you find that any of the following Defendants caused, suffered, allowed, or permitted the collection, handling, Storage, Processing, or Disposal of Industrial Solid Waste in such a manner so as to cause:

1. The Discharge or imminent threat of Discharge of Industrial Solid Waste into or adjacent to the Water in the State;

2. The creation and maintenance of a nuisance; or

3. The endangerment of the public health and welfare

at any time from December 31, 1975, until March 30, 2008?[1]

"Disposal" means the Discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste (whether containerized or uncontainerized) into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be discharged into any waters.[2]

In this question, "Discharge" means accidental or intentional spilling, leaking, pumping, pouring, emitting, emptying, or dumping of waste into or on any land or water[3]

Answer "Yes" or "No" for each Defendant

a    Champion Paper (before December 31, 2000)        _____

b.   International Paper (on or after December 31, 2000):   _____

c    MIMC.                                            _____

d    GC Environmental (before December 31, 2003).     _____

e    Waste Management of Texas (on or after December 31, 2003):  _____

offered - ✓

ACCEPTED:_____

REFUSED ____✓_____

Judge Caroline Baker
11/11/14

---

[1] TEX WATER CODE § 7 101, 30 TEX ADMIN CODE § 335 4

[2] 30 TEX ADMIN CODE § 335 1(44)

[3] 30 TEX ADMIN CODE § 335 1(43)

G

No. 2011-76724

| | | |
|---|---|---|
| Harris County, Texas, *et al*, *Plaintiff,* | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| International Paper Company, *et al*, | § | |
| *Defendants* | § | 295th JUDICIAL DISTRICT |

**Plaintiff Harris County's Requested Question Number Nine**
**(Additional Question)**

Did the sludge become a fixture on the property where the Site is located?

Answer "Yes" or "No": _____

Offered: ✓

_____
Granted

_____✓_____
Refused

_____
Modified as Follows:

Judge Caroline Baker
11/11/14

35113

No. 2011-76724

| Harris County, Texas, *et al , Plaintiff,* | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| International Paper Company, *et al ,* | § | |
| *Defendants* | § | 295th JUDICIAL DISTRICT |

## Plaintiff Harris County's Requested Instruction Number Seventeen
### (Instruction for Requested Question Number Nine)

For the sludge to become a fixture, it must become a permanent part of the land.

Offered: ✓

_____
Granted

_____✓_____
Refused

_____
Modified as Follows:

Judge Caroline Baker
11/11/14

35114

No. 2011-76724

| | | |
|---|---|---|
| Harris County, Texas, *et al*, *Plaintiff*, | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| International Paper Company, *et al*, | § | |
| *Defendants* | § | 295th JUDICIAL DISTRICT |

**Plaintiff Harris County's Requested Instruction Number Eighteen**
**(Instruction for Requested Question Number Nine)**

In deciding whether the sludge became a permanent party of the land, you should consider:

1. The mode and sufficiency of annexation of the sludge, either real or constructive,
2. The adaptation of the sludge to the use or purpose of the land, and
3. The intention of the party who annexed the sludge to the land

Offered: ✓

_____
Granted

✓
_____
Refused

_____
Modified as Follows

Judge Caroline Baker
11/11/14

35115

No. 2011-76724

| Harris County, Texas, *et al*, *Plaintiff,* | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| International Paper Company, *et al*, | § | |
| *Defendants* | § | 295th JUDICIAL DISTRICT |

## Plaintiff Harris County's Requested Question Number Ten
## (Additional Question)

Did the sludge improve the market value of the property where the Site is located?

Answer "Yes" or "No": _____

Offered: ✓

_____
Granted

✓
_____
Refused

_____
Modified as Follows:

Judge Caroline Baker
4/11/14

35116



Sometimes when people haven't been through this process before, maybe they're a little nervous, may have some other reason, they might have a tendency to look to the Judge to see how they should react to the evidence. That is not okay. First of all, it's irrelevant what I think.

I'm here simply to administer the law. You will see me doing some other things, because I'm presiding over other cases while I'm presiding over this trial, and I may be signing orders and things. I have an expressive face. I might be reacting to something that has nothing do with this lawsuit. It's not fair to these fine attorneys and their clients for you to look to anyone else, including me, to decide what you think about the evidence. I need to make sure that every juror is comfortable making the commitment that you will decide for yourselves what you think about the evidence in this case.

Is everybody comfortable making that commitment?

THE JURY (COLLECTIVELY): Yes.

THE COURT: Does anybody have any questions about the process, as I've described it?

All right. Then at this time, I'm going to read to you two stipulations. These are -- a

stipulation is simply an agreement of something that's not going to be litigated in this case, it's not going to be in dispute in this case. And so I'm going to read these into evidence, and then we will move on to the opening statements. All right.

"In March 2008, the US Environmental Protection Agency listed the site at issue in this suit as a federal Superfund site. Since 2008 the EPA has been overseeing the environmental investigation, removal and remediation of the site that is being performed or paid for by the defendants, as required by federal law. That process is ongoing and will result in the EPA selecting a method for permanently cleaning up the site.

Participating in the Superfund process has no bearing on whether a party is liable under the Texas statutes claimed in this lawsuit. The lawsuit you are here about is separate and independent of the EPA's Superfund process. If any penalty payments are assessed in this lawsuit, the money will not be for the ongoing site remediation or ultimate cleanup. Any such money will be paid into the Harris County General Fund and the State of Texas General Revenue Fund. The money can be used for any lawful purpose by Harris County and the State of Texas.

In July 1985, the EPA listed dioxin as a

hazardous substance. As a result of its determination that dioxin may be harmful to the public health or the environment, the EPA listed the site as a Superfund site in 2008, due to the presence of dioxin. The fact that the EPA designated the site as a Superfund site is not a factor for you to consider in this case in determining whether any Texas statute has been violated."

Does everybody understand the stipulation?

(Whereupon, there was no verbal response by the jurors)

THE COURT: All right. With that, we will proceed with opening statements.

Mr. Wotring.

### OPENING STATEMENTS

BY MR. WOTRING

Good morning. Here is where we are: This is the -- not probably -- this is the last time I will be able to address you-all directly about what Harris County believes the evidence will be in this case. So believe it or not, this is supposed to be a brief thumbnail sketch of the evidence; and this is a lawyer's idea of a brief thumbnail sketch of the evidence.

It won't be the last time you-all get to hear the evidence because this is not evidence. This is an introduction to the evidence, kind of to set the